# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

City of Duluth,

                Plaintiff,                  **MEMORANDUM OPINION AND ORDER**

    v.                                              Civil No. 09-2668 ADM/RLE

Fond du Lac Band of
Lake Superior Chippewa,

                Defendant.

_____

David P. Sullivan, Esq., Madeira Beach, FL; and Robert C. Maki, Esq., and Shawn B. Reed, Esq., Maki & Overom Chartered, Duluth, MN, on behalf of the Plaintiff.

Dennis J. Peterson, Esq., Fond du Lac Band of Lake Superior Chippewa Legal Affairs Office, Cloquet, MN; and Henry M. Buffalo, Jr., Esq., Mark A. Anderson, Esq., Vanya S. Hogen, Esq., and Sara K. Van Norman, Esq., Jacobson, Buffalo, Magnuson, Anderson & Hogen, PC, St. Paul, MN, on behalf of Defendant.
_____

## I. INTRODUCTION

On February 4, 2010, the undersigned United States District Judge heard oral argument on Plaintiff City of Duluth's ("the City") Motion for Summary Judgment [Docket No. 7]. In its Complaint [Docket No. 1], the City alleges that Defendant Fond du Lac Band of Lake Superior Chippewa ("the Band") breached contractual obligations created when the City and the Band agreed to establish a casino in downtown Duluth. Upon a finding of the Band's breach of contract, the City seeks a declaration that the contracts are valid and enforceable, damages, and an injunction ordering the Band to comply with its obligations under the contracts or, in the alternative, accelerated damages for the estimated amounts that will be owed to the City for the remainder of the contractual relationship, which extends to March 31, 2036. The Band's Answer [Docket No. 3] asserts counterclaims alleging that the contracts are unenforceable because they

are illegal under federal law, unconscionable, lacking in consideration, and the product of mutual mistake. For the reasons set forth below, the City's Motion is granted in part and denied in part.

## II. BACKGROUND[1]

This dispute arises out of a business relationship between the City and the Band that began in the1980s. Representatives of the City and the Band first met in 1984 to discuss entering a joint venture. Compl. ¶ 12. By 1986, the parties had executed a series of agreements ("the 1986 Agreements") relating to the creation and operation of a casino in downtown Duluth. Id. ¶¶ 15-22. The 1986 Agreements, approved by the United States Secretary of the Interior, provided that the Band purchase land in downtown Duluth and, with the City's approval, transfer the land to the United States, which would hold the land in trust for the Band, declare it a reservation, and authorize the operation of gaming activities on the land. Id. ¶¶ 15-19; Pl.'s Exs. in Supp. of Mot. for Summ. J. [Docket Nos. 10-13], Pl.'s Ex. 7A ("Commission Agreement") § 10.a.

The 1986 Agreements also created the Duluth-Fond du Lac Economic Development Commission ("the Commission"), comprised of four appointees by the Band and three appointees by the City, to manage gaming operations at the casino, named the Fond du Luth Casino. Compl. ¶¶ 17, 19, 22; Commission Agreement §§ 4, 5, 11.a. The revenue from the Commission's activities was to be split between the Band, the City, and the Commission, which were to receive 25.5%, 24.5%, and 50%, respectively. Compl. ¶ 20. "The revenues retained by the Commission were to be used for economic development both on the Band's reservation

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

southwest of [Duluth] and that within the downtown area . . . ." Id. ¶ 21

On October 17, 1988, President Ronald Reagan signed the Indian Gaming Regulatory Act ("IGRA" or "the Act"), Pub.L. 100-497, 102 Stat. 2467 (1988) (codified as amended at 25 U.S.C. §§ 2701-2721). The Band filed suit in federal court (case number 5-89-163) the following year, seeking a declaration that the 1986 Agreements with the City violated a provision of the IGRA, 25 U.S.C. § 2710(b)(2)(A), which requires that an Indian tribe "have the sole proprietary interest and responsibility for the conduct of any gaming activity" on Indian lands. Pl.'s Ex. 9 ("1989 Compl.") ¶¶ 32-33. The City and the Band requested the Associate Solicitor of Indian Affairs review the arrangement between the City and the Band, which resulted in a November 1990 opinion letter that the City's share of net profits under the Commission Agreement amounted to a violation of the sole proprietary interest and responsibility requirement of § 2710(b)(2)(A). Van Norman Aff., Jan. 14, 2010 [Docket No. 45], Ex. F at 2-4. In December 1990, United States District Judge Paul A. Magnuson dismissed the Band's action without prejudice on the ground that "the public interest is best served by allowing the Federal regulatory authority established by the IGRA," the National Indian Gaming Commission ("NIGC"), to review the arrangement regarding the Fond du Luth Casino and give its recommendations. Pl.'s Ex. 10 ("Dec. 26, 1990 Order") at 6-7.

The NIGC reviewed the 1986 Agreements and, in September 1993, concluded that "the current operation of the [Fond du Luth Casino] violates the Indian Gaming Regulatory Act" because "the Band does not have the sole ownership or control of the . . . Casino." Pl.'s Ex. 11 at 1-2. The NIGC Chairman advised the parties that "unless the Band and the City are able to settle the pending dispute, [the NIGC] will be initiating an enforcement action to bring the Fond

du Luth [Casino] into compliance with IGRA." Id. at 1.

The parties' settlement negotiations produced an agreement in June 1994. Pl.'s Ex. 13 at 1. The NIGC reviewed the settlement agreement, concluded that it "returns full ownership and control of the Fond du Luth Casino to the Band and is consistent with the requirements of IGRA," and issued a report and recommendation to Judge Magnuson that the settlement agreement be approved. Id.; Pl.'s Ex. 14. Accordingly, seven new agreements were executed on June 20, 1994 ("the 1994 Agreements"), which, among other things, (1) abrogated two of the 1986 agreements; (2) modified the Commission Agreement to restructure the Commission as being comprised of two people, the Mayor of the City and the Chair of the Band; (3) provided that the Band would sublease the Fond du Luth Casino from the Commission; and (4) provided that through March 30, 2011, the rent paid by the Band would equal 19% of the gross revenue from "Video Games of Chance" and would be permanently assigned to the City (the parties were to meet by January 1, 2010, to negotiate in good faith regarding the percentage of revenue owed to the City for the 25 year term beginning on April 1, 2011). See Pl.'s Exs. 18-18F; Compl. ¶¶ 34-40. The parties returned to federal court on a new civil action (case number 5-94-82) filed by the Band for injunctive relief and a declaration that the 1986 Agreements are invalid as contravening § 2710(b)(2)(A). Pl.'s Ex. 16 ("1994 Complaint"). Guided by the new arrangement set forth in the 1994 Agreements, the parties entered into a stipulation, agreeing that (1) dismissal of the Band's action with prejudice was warranted; (2) the 1994 Agreements complied with the sole proprietary interest requirement of § 2710(b)(2)(A); (3) the NIGC reviewed the 1994 Agreements and concluded that they are in conformance with the IGRA; and (4) the 1994 Agreements and all of its attachments "are in their entirety expressly incorporated

4

into this Stipulation and Consent Order, and are hereby expressly made a part of it." Pl.'s Ex. 17 ¶¶ 7-10. The parties also informed Judge Magnuson that they "jointly desire the Court's approval in order to ensure binding implementation of the settlement agreement." Pl.'s Ex. 19 at 12. Judge Magnuson issued a consent decree approving the parties' stipulation, dismissing the Band's complaint with prejudice, and ordering that the court retain jurisdiction over the matter for purposes of ensuring the parties' compliance with the 1994 Agreements. Id. at 7.

On January 28, 2009, the Band informed the City that its auditors had advised the Band that the Fond du Luth Casino had been incorrectly treating certain promotional expenditures as operating expenses rather than as "contra-revenues," i.e., offsets against revenue. Pl.'s Ex. 21. As a result, the Band declared, the Fond du Luth Casino's gross revenue since the execution of the sublease through the third quarter of 2008 was lower than originally calculated and, consequently, the calculation of the quarterly payments due to the City also should have been lower. Id. The Band concluded that the City had been overpaid by $561,047.59 and stated that it intended to apply this amount as an offset against future payments to the City. Id. The City responded on May 12, 2009, disagreeing with the Band's position that accounting adjustments were warranted. See Pl.'s Ex. 22.

On August 6, 2009, the Band sent the City a letter and a resolution that had been passed by the Band's Business Committee, announcing that the Band was ceasing all payments to the City under the 1994 Agreements. The Band asserted the City has no legally assertable proprietary interest in the Fond du Luth Casino, the parties' agreements were premised on the erroneous assumption that the City's approval in 1986 of the creation of the reservation had legal effect, and the City has received more than $80 million under the arrangement but has provided

5

no valuable consideration in return. Pl.'s Exs. 23, 24. The City responded on August 12, 2009, declaring that the Band's August 6 letter and resolution constituted a default or breach of the 1994 Agreements and requesting that the Band cure its default or breach within thirty days. Pl.'s Ex. 25. The Band did not respond, and the City filed this action on September 29, 2009.

## III. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

The City argues that there are no genuine issues of material fact contesting the Band's breach of its contractual obligations by (1) unilaterally deducting the $561,047.59 claimed overpayment from the City's payments, (2) announcing that it would continue to deduct contra-revenue in calculating revenue and the City's payments, and (3) adopting the August 6, 2009 resolution, declaring the Band was ceasing all payments to the City in connection with the Casino. The Band opposes summary judgment, arguing its contractual agreements with the City

6

are invalid and unenforceable and that factual issues persist on damages sought by the City. The City responds that res judicata and judicial estoppel bar the Band from asserting defenses of invalidity and unenforceability of the contracts and any fact issues on damages do not preclude summary judgment on liability.

**B.     Res Judicata**

"The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" Taylor v. Sturgell, 553 U.S. 880, 128 S. Ct. 2161, 2171 (2008). "Claim preclusion" precludes a second action on a claim, or any part of a claim, that was resolved by a valid, final adjudication. Baker ex rel. Thomas v. Gen. Motors Corp., 522 U.S. 222, 233 n.5 (1998). "Issue preclusion" on the other hand, binds parties in a second action to an issue of fact or law that was actually litigated and resolved by a valid final judgment in a previous action, regardless of whether the claims in the two actions were the same. Id. In general, a judicially approved consent decree is a final judgment on the merits for purposes of res judicata. See Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc., 138 F.3d 351, 356-57 (8th Cir. 1998) (citing United States EPA v. City of Green Forest, 921 F.2d 1394, 1402-05 (8th Cir. 1990)); see also Minn. v. CMI of Ky., Inc., Civil No. 08-603, 2009 WL 5216841, at *1 (D. Minn. Feb. 9, 2009) ("A consent judgment embodies an agreement of the parties and is also an agreement that the parties expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.") (citing Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378 (1992)).

The City argues res judicata bars the Band from challenging the validity of the 1994 Agreements because the consent decree, which acknowledges the parties' agreement that the

7

1994 Agreements comply with the IGRA and are otherwise valid, constitutes a final adjudication. Because the consent decree retains the court's jurisdiction to enforce the 1994 Agreements, the Band contends it is not barred from challenging the validity of the 1994 Agreements based on changes in the law. The Band argues a change in the law occurred because the NIGC's recent opinions in other cases demonstrate that the payments to the City under the 1994 Agreements grant the City a proprietary interest in tribal gaming activity, in violation of the IGRA. The Band cites a line of cases holding that a consent decree is not a final judgment for purposes of separation of powers principles and thus may be reopened, modified, set aside, or terminated in response to legislative action without violating separation of powers principles. See Plyler v. Moore, 100 F.3d 365, 371-72 (6th Cir. 1996) (holding that because a consent decree "provides for prospective relief and is subject to the continuing supervisory jurisdiction of the district court[,] . . . it is akin to a final judgment granting injunctive relief, and thus it is subject to subsequent changes in the law"); accord Gavin v. Branstad, 122 F.3d 1081 (8th Cir. 1997).

Whether a consent decree may be set aside or modified in response to a legislative change in the law without violating separation of powers principles, the issue in Plyler and Gavin, is an entirely different question from whether a consent decree constitutes a final judgment for purposes of res judicata. See Axel Johnson Inc. v. Arthur Andersen & Co., 6 F.3d 78, 84 (2d Cir. 1993) ("[N]ot all judgments that are final for purposes of res judicata are final for Fifth Amendment and separation of powers purposes."). The law is well established that a consent decree is a final judgment for purposes of res judicata. See City of Green Forest, 921 F.2d at 1402-05. However, this conclusion does not necessarily mean that the consent decree is

unassailable and that the Band is precluded from raising its challenges to the validity of the 1994 Agreements. As both parties acknowledge, the Supreme Court's decision in Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992), the basis for the separation of powers decision in Plyler and Gavin, makes clear that a consent decree may indeed be reopened under certain circumstances.

However, in contrast to Rufo, Plyler, Gavin, and the other cases relied on by the Band, the instant case was not commenced by a party arguing that a change in the law warranted modification of a consent decree and therefore starting proceedings by filing a motion expressly asking for such relief. Rather, it was filed as a breach of contract action by the other party to the agreements. The Band's challenge to the validity of the 1994 Agreements, which were the subject of judicial approval by Judge Magnuson's consent decree, require revisiting the consent decree through a motion under Federal Rule of Civil Procedure 60(b). See Horne v. Flores, 129 S. Ct. 2579, 2593 (2009); Hook v. Arizona, 972 F.2d 1012, 1016 (9th Cir. 1992) (citing Rufo and holding that "[t]he proper procedure for seeking relief from a consent decree is a Rule 60(b) motion"). In the absence of a motion under Rule 60(b), Rule 60(d)(1) acknowledges a district court has inherent power to "entertain an independent action to relieve a party from a judgment, order, or proceeding." But the Band's counterclaims, although arguably an independent action under Rule 60(d)(1), are directed at the 1994 Agreements and do not expressly seek relief from the consent order itself.

**C.      Judicial Estoppel**

"The doctrine of judicial estoppel provides that when a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not, thereafter, simply

9

because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." Gray v. City of Valley Park, 567 F.3d 976, 981 (8th Cir. 2009) (quotation omitted). "This rule generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Id. "The purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." Id.

The City argues that the Band's position that it is not required to submit payments to the City because the 1994 Agreements are invalid is contrary to its position fifteen years ago when Judge Magnuson issued the consent decree that the 1994 Agreements were valid. Therefore, the City concludes, judicial estoppel bars the Band from repudiating the 1994 Agreements. The Band responds that judicial estoppel does not apply because it changed its position only after changes in the law—the same claimed changes mentioned in the previous analysis of the res judicata issue. See Longaberger Co. v. Kolt, 586 F.3d 459, 470 (6th Cir. 2009) (joining several other circuit courts in holding that judicial estoppel is inappropriate when a party is merely changing its position in response to a change in the law). In the context of the facts of this case, judicial estoppel does not apply if there has indeed been a change in the law—which is the issue discussed in the next section.

### D.  Relief from the Consent Decree

As noted above, see supra III.B, the proper mechanisms for seeking relief from the consent decree have not been invoked. Although both parties refer to the Rufo standard applicable to a Rule 60(b) motion, no motion has been filed under Rule 60(b) seeking relief from

10

the consent decree issued by Judge Magnuson in the suit from 1994 (case number 5-94-82). Nor is it certain that the Band's intent was to assert an independent action under Rule 60(d)(1). As pleaded, the Band's counterclaims attack the validity of the 1994 Agreements but do not expressly ask for relief "from a judgment, order, or proceeding." But regardless of whether Rule 60(b) or Rule 60(d) is the appropriate avenue to seek relief from the consent decree to allow for reconsideration of the validity of the 1994 Agreements, the Court concludes that the standard required of each of these vehicles of review of the consent decree has not been satisfied.

The standard that must be met to warrant reopening a consent decree pursuant to Rule 60(b) is a "flexible standard" that involves considerations of equity and requires a showing "that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstances." Rufo, 502 U.S. at 391. The ability to seek relief through an independent action, as recognized by the codification of Rule 60(d)(1), is available only to prevent a "grave miscarriage of justice." United States v. Beggerly, 524 U.S. 38, 47 (1998). To prevent the restrictions of Rule 60(b) from "be[ing] set at naught," independent actions under Rule 60(d) are "reserved for those cases of 'injustices which, in certain instances, are deemed sufficiently gross to demand a departure' from rigid adherence to the doctrine of res judicata." Id. at 46 (quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244 (1944)).

> "The indispensable elements of such a cause of action are (1) a judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; and (5) the absence of any adequate remedy at law."

11

11 Wright, Miller & Kane, Federal Practice and Procedure, Civil 2d § 2868 (quoting Nat'l Sur. Co. of New York v. State Bank of Humboldt, 120 F. 593, 599 (8th Cir. 1903)).

The Band argues that modifying the consent decree is warranted in response to a significant change in the law of the IGRA. The statutory text at issue has not been amended since the IGRA was enacted in 1988 and provides:

> (2) The Chairman shall approve any tribal ordinance or resolution concerning the conduct, or regulation of [gaming activity] on the Indian lands within the tribe's jurisdiction if such ordinance or resolution provides that—
>
>> (A) except as provided in paragraph (4), the Indian tribe will have the sole proprietary interest and responsibility for the conduct of any gaming activity;
>>
>> (B) net revenues from any tribal gaming are not to be used for purposes other than—
>>
>>> (i) to fund tribal government operations or programs;
>>>
>>> (ii) to provide for the general welfare of the Indian tribe and its members;
>>>
>>> (iii) to promote tribal economic development;
>>>
>>> (iv) to donate to charitable organizations; or
>>>
>>> (v) to help fund operations of local government agencies . . . .

25 U.S.C. § 2710(b)(2)(A)-(B).[2] The change the Band cites is in the construction of the term

---

[2] The requirements apply to Class II and Class III gaming activities. See 25 U.S.C. § 2710(b), (d). Class II gaming includes bingo and card games except for "banking" card games like baccarat, chemin de fer, and blackjack. 25 U.S.C. § 2703(7). Class III gaming includes banking card games and slot machines. 25 U.S.C. § 2703(8). There appears to be no dispute that "Video Games of Chance," the gross revenue from which is used to calculate the City's quarterly payment, falls either in Class II or Class III gaming activities.

"proprietary interest," which is not defined in the IGRA or the Code of Federal Regulations. The Band explains that when the NIGC concluded in 1994 that the 1994 Agreements returned full ownership and control of the Fond du Luth Casino to the Band and were consistent with the requirements of the IGRA, "the NIGC was very new at that time, and under the standards it has developed since that time through its advisory opinions and enforcement actions, it is certain that the NIGC would not reach the same result now." Def.'s Resp. to Mot. for Summ. J. [Docket No. 43] at 20. The advisory opinions and enforcement actions on which the Band relies include the following:

- A June 2007 proposed civil fine assessment by the NIGC, finding that an outside company hired to manage blackjack and gaming machine operations at casinos on Indian lands had acquired a proprietary interest in the gaming activity, in violation of § 2710(b)(2)(A), when the company received 53.8% of net revenue, Van Norman Aff., Jan. 14, 2010, Ex. J at 7;

- An October 2006 advisory letter from the NIGC concluding that an outside party retained to develop two casinos had acquired a proprietary interest in gaming operations on Indian lands because of "the excessive amount of revenue it will be paid from the Tribe's gaming facility relative to the services provided," Id., Ex. K at 6-7;

- A February 2005 letter from the NIGC Chairman to the Senate Committee on Indian Affairs recounting some of the situations in which the NIGC opined that an arrangement between a tribe and an outside party violated the sole proprietary interest requirement, Washburn Aff., Jan. 13, 2010 [Docket No. 46], Ex. C at 4-6;

- An NIGC advisory letter from July 2004 concluding that an outside developer had acquired an illegal proprietary interest in gaming activity because the development contracts provided the developer with 75% of net revenue in the first five years and 16% of gross revenue for the next ten years, Id., Ex. E at 2;
- An April 2004 advisory letter from the NIGC concluding that development contracts entitling a developer to 75% of net revenue in the first five years and 18% of gross revenue for the next ten years violated the sole proprietary interest requirement, Van Norman Aff., Jan. 14, 2010, Ex. M at 4; and
- A June 2003 advisory letter from the NIGC concluding that gaming related contracts that required a tribe to pay, ostensibly as rent, 35% of net gaming revenues for a period of ten years to an outside developer violated the sole proprietary interest requirement, Washburn Aff., Jan. 13, 2010, Ex. D at 5.

The City responds that these opinions by the NIGC have no affect on the arrangement between the City and the Band, which was already given approval by a final NIGC decision, the 1994 report and recommendation to Judge Magnuson. In addition, the City maintains, these indicia of a "change in the law" do not constitute final agency decisions and, as such, they do not have the effect of law. See NGV Gaming, Ltd. v. Upstream Point Molate, LLC, 355 F. Supp. 2d 1061, 1065 (N.D. Cal. 2005) (concluding that a letter by the NIGC that expressed the view that a set of agreements between a tribe and an outside developer provided the outside developer with an impermissible proprietary interest in the tribe's gaming activity was an "advisory opinion . . . that . . . has no legal effect because it is not a final decision of the agency"). The Band does not dispute that the letters are advisory opinions from the NIGC on the sole proprietary interest

requirement, but contends that the Court may nonetheless examine them and adopt their analyses to the extent they are persuasive. See Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 127 (2d Cir. 2008) (concluding that the NIGC's interpretation in an opinion letter "'lack[s] the force of law'" and is entitled only to Skidmore[3] deference, meaning deference only to the extent that it is persuasive) (quoting Christensen v. Harris County, 529 U.S. 576, 587 (2000)).

The Court concludes that the Band has failed to demonstrate a cognizable change in the law required under Rule 60(b) and Rufo. In Agostini v. Felton, the Supreme Court clarified that the standard established in Rufo for a Rule 60(b) motion requires a showing that there have been "changes in either statutory or decisional law." 521 U.S. 203, 215 (1997). The opinion letters by the NIGC, however predictive of the NIGC's decision if it were to consider the arrangement regarding the Fond du Luth Casino anew, do not constitute changes in either statutory or decisional law.[4] See Hans v. Matrixx Initiatives, Inc., No. 3:04-CV-540, 2010 WL 558780, at *1 (W.D. Ky. Feb. 10, 2010) (concluding that an FDA nationwide advisory opinion announcing a change in position did not meet the standard of a "change in decisional law" as required to warrant relief under Rule 60(b)). The differences between the role of an agency and the role of the courts reinforces the conclusion that a change in an agency's interpretation of the law is not the same as a change in the courts' interpretation of the law. Cf. Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp., 26 F.3d 375, 386-87 n.8 (3d Cir. 1994) (explaining the differences between agencies and Article III courts and stating that "courts insulated from the dynamic political pressures agencies face should jealously guard their protective power to watch

---

[3] Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

[4] By its decision today, the Court expresses no opinion regarding the correct interpretation of the term "proprietary interest" in § 2710(b)(2)(A).

15

over agencies, so that agencies' retrospective changes to the law do not brand conduct that was legal when performed illegal when challenged when to do so would cause 'manifest injustice'").

The Band also argues that the payments to the City under the 1994 Agreements amount to an impermissible tax on the Band, in violation of 25 U.S.C. § 2710(d)(4), which provides that "nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or any other person or entity authorized by an Indian tribe to engage in class III activity." The Band does not contend that its position that the 1994 Agreements violate § 2710(d)(4) is attributable to a change in the law. The showing required under Rufo to justify reopening a consent decree has not been made.

The parties' stipulated to the validity of the 1994 Agreements and their compliance with IGRA. Further, the parties sought to give their stipulation the imprimatur of judicial approval. To seek relief from the consent decree, which is a final judgment, the Band must make the necessary showing required under Rufo. In the absence of such a showing, principles of res judicata preclude reconsidering issues resolved in the consent decree, namely, the validity of the 1994 Agreements.[5]

The Band warns that the 1994 Agreements are unlawful under the NIGC's current standards and expose both the Band and the City to potentially serious penalties should the NIGC initiate an enforcement action. An affidavit submitted by the Band requests the Court to "perform a valuable service to the public, the NIGC, the Indian gaming industry as a whole, non-

---

[5] Because the Band cannot meet the standard required of a Rule 60(b) motion, "it certainly fails to meet the more stringent 'grave miscarriage of justice standard' applicable to independent actions," as permitted under Rule 60(d). Gottlieb v. Sec. & Exch. Comm'n, 310 F. App'x 424, 425 (2d Cir. 2009) (quotation omitted).

tribal contractors, Indian tribes, and Indian people [by] . . . reach[ing] the substantive issue of whether the 1994 Agreements violated IGRA's 'sole proprietary interest' principle." Washburn Aff., Jan. 13, 2010 ¶ 26. It may be that the arrangement between the Band and the City violates the IGRA in the eyes of the NIGC. But until the NIGC initiates an enforcement action regarding the Fond du Luth Casino and proceeds with that action to a final decision on the substantive issue of proprietary interest, this Court's view would constitute an advisory opinion.

**E.     The Scope of Summary Judgment**

The Band next argues that granting summary judgment on both liability and damages would be inappropriate because the damages recovery sought by the City raises fact issues. The City seeks a damages award for the Band's January 2009 announcement that it was retroactively reducing the payments made to the City since 1994 by $561,047.09 due to a 2008 clarification in accounting principles regarding the correct treatment of promotional expenditures, which, when applied, resulted in lower gross revenues for those years. A section in the Sublease, one of the documents included in the 1994 Agreements, governs the calculation of the quarterly payments to the City:

> 4.2.2   <u>Calculation of Payments</u>.  The Band agrees that the City Percentage of Gross Revenues from Video Games of Chance to be paid by the Band to the City . . . shall be calculated as follows:
>
> . . . .
>
> (ii).  "Gross Revenues from Video Games of Chance" is defined as total revenues minus pay-outs to players . . . .

Pl.'s Ex. 18A §§ 4.2.2, 4.2.2.1(ii). Based on this language, the City contends that the Sublease dictates that gross revenue is calculated without reference to consideration of accounting principles. For that reason, the City argues the clarification in accounting principles is irrelevant

17

and the Band breached the Sublease by reducing the City's payments in reliance on the clarification.

The City's argument overlooks Section 1.2 of the Sublease, entitled, "Interpretation," which provides that "[u]nless otherwise expressly provided herein, any terms pertaining to accounting or financial matters shall be interpreted in accordance with generally accepted accounting principles consistently applied." Pl.'s Ex. 18 § 1.2. While "gross revenue" is given an express definition, that definition refers to another accounting term, "revenue," which is not expressly defined in the Sublease. Thus, by operation of Section 1.2, the interpretation of "revenue" must be in accord with generally accepted accounting principles. And if accounting principles require certain promotional expenditures to be "offset against *revenue* rather than reported as expenses," Pl.'s Ex. 21 (emphasis added), the Sublease's definition of "gross revenues," which in turn refers to "revenue," requires consideration of generally accepted accounting principles. Accordingly, the contra-revenue issue cannot be resolved by reference to the terms of the Sublease alone.

The parties' submissions identify a dispute regarding whether the 2008 clarification is applicable. The City's argument is that because the clarification was made in a "draft," it is not "the most current edition of Accounting and Audit Guide Casinos . . . and therefore is not mandatory." Pl.'s Ex. 22 at 1-3 (quotation marks omitted). The Band disagrees with the City's position and contends that resolving the dispute over whether the clarification is controlling of the matter is a fact-intensive, technical issue that will require expert testimony. The City's only response, one already rejected by the Court, is that the Sublease alone dictates the calculation of gross revenues. On the current record, material fact issues remain regarding the contra-revenue

18

issue, and, therefore, summary judgment on the issue of damages for the contra-revenue reduction is denied.

In the alternative to specific performance of the 1994 Agreements, the City's Complaint seeks accelerated damages for nonpayment of the quarterly payments for the 25 year extension term, which begins April 1, 2011. The Band argues that fact issues persist on the amount of the future payments claimed as damages by the City. The City seems to agree that summary judgment is not warranted as to the amount of future damages: in its reply brief, the City clarifies that summary judgment as to liability for the future payments is appropriate but that, per the 1994 Agreements, determining the amount of those payments will require further proceedings, specifically, binding arbitration. Indeed, the 1994 Agreements provide that the Band and the City are to meet and negotiate in good faith concerning the percentage of gross revenues from video games of chance payable to the City for the 25 year term beginning on April 1, 2011, on or before January 1, 2010; that if no agreement is reached by June 30, 2010, they are to meet with the NIGC for mediation; and that if no agreement is reached by October 1, 2010, they are to submit the dispute to binding arbitration. Pl.'s Ex. 18A § 4.2.2.5.

In light of the Band's position, the City's response, and the operative provision of the 1994 Agreements, the Court concludes that summary judgment is not appropriate as to the amount of future damages for the quarterly payments that will be owed to the City for the 25 year term beginning on April 1, 2011.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff City of Duluth's Motion for Summary Judgment [Docket No. 7] is **GRANTED IN PART** and **DENIED IN PART**.

BY THE COURT:

    <u>s/Ann D. Montgomery</u>
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: April 21, 2010.