## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

City of Duluth,                                             Civil No. 09-2668 (SRN/LIB)

            Plaintiff,

                                        **MEMORANDUM OPINION**
    v.                                                      **AND ORDER**

Fond du Lac Band of Lake Superior
Chippewa,

            Defendant.

---

David P. Sullivan, Robert C.  Maki, and Shawn B. Reed, 31 West Superior St., No. 402, Duluth, MN 55802, for Plaintiff.

Henry M. Buffalo, Vanya S. Hogen, and Jessica Intermill, Jacobson, Buffalo, Magnuson, Anderson & Hogen, P.C., 335 Atrium Office Bldg., 1295 Bandana Blvd., St. Paul, MN 55108; and Dennis Peterson, Tribal Attorney, Fond du Lac Band of Chippewa Legal Affairs Office, 1720 Big Lake Rd., Cloquet, MN 55720, for Defendant.

---

SUSAN RICHARD NELSON, United States District Judge

       This matter is before the court on Defendant's motion for relief under Rule 60(b) from several orders of this Court (Doc. No. 207).  For the reasons stated below, this Court grants the motion in part and denies the motion in part.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

       In 1986, the City of Duluth and the Fond du Lac Band of Lake Superior Chippewa entered into a joint venture to operate a gaming facility on tribal trust land located within the City, under which the City would derive a substantial portion of the casino's

revenues.[1]  In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), which requires that Indian tribes have "sole proprietary interest" in, and responsibility for, Indian "gaming activity."  25 U.S.C. § 2710(b), (d).  The Act expressly applies to pre-existing operations.

In 1989, the Band filed a declaratory judgment action against the City in an attempt to convince the City to renegotiate a new agreement in light of the IGRA.  The parties ultimately settled their dispute.  In 1994, the Court (J. Magnuson) entered a Consent Order incorporating a group of settlement agreements between the City and the Band (the "1994 Agreements").  (Doc. No. 11-7.)  The Order and 1994 Agreements were premised on the approval by the National Indian Gaming Commission ("NIGC") of the Agreements as being in compliance with the IGRA.  The NIGC promptly approved the agreements.

Under the 1994 Agreements and Order, the City and the Band reorganized their relationship to eliminate the joint venture, but the City nevertheless retained certain rights regarding various aspects of operating the casino.  The parties agreed on an "Initial Term" of seventeen years (from 1994 through March 31, 2011), with an "Extension Term" of twenty-five years (from April 1, 2011 to 2036).  Most importantly, for present purposes, the Band was obligated during the Initial Term to pay to the City, on a quarterly basis, nineteen percent of the casino's gross revenues as "rent" ("Rent Item No. 2").  They also

---

[1]     For a more complete recitation of the facts, see City of Duluth v. Fond du Lac Band of Lake Superior Chippewa, 708 F. Supp. 2d 890, 893-95 (D. Minn. 2010); City of Duluth v. Fond du Lac Band of Lake Superior Chippewa, 2010 WL 3861371, *1-6 (D. Minn. July 12, 2010).

agreed in 1994 to determine the rate of rent for the Extension Term when the beginning of

that term approached and further agreed on a procedure, culminating in binding

arbitration, for resolving any inability of the parties themselves to agree on the new rate.

Between 1994 and 2009, the Band operated the casino and paid the City the rent

owed under the 1994 Agreements.  In January 2009, however,

> the Band informed the City that its auditors had advised the Band that the . .
> . Casino had been incorrectly treating certain promotional expenditures as
> operating expenses rather than as "contra-revenues," i.e., offsets against
> revenue.  As a result, the Band declared, the . . . Casino's gross revenue
> since the execution of the sublease through the third quarter of 2008 was
> lower than originally calculated, and, consequently, the calculation of the
> quarterly payments due to the City also should have been lower.  The Band
> concluded that the City had been overpaid by $561,047.59 and stated that it
> intended to apply this amount as an offset against future payments to the
> City.

City of Duluth v. Fond du Lac Band of Lake Superior Chippewa, 708 F. Supp. 2d 890,

896 (D. Minn. 2010).  In August 2009, the Band then informed the City that, pursuant to a

tribal resolution, it was ceasing all payments to the City because the parties' arrangement

did not comply with governing law.  Id.  The City declared the Band in default for

breaching the 1994 Agreements.  Id.

In September 2009, after the Band did not respond to the City's request that it cure

its breach, the City commenced this action to enforce the 1994 Agreements.  (Doc. No.

1.)  In addition to asserting claims for breach of contract, it also sought declaratory and

injunctive relief.  (Id.)  The Band's Answer included the following counterclaims:  a

claim for declaratory relief that "certain terms" of the 1994 Agreements are invalid, and

three claims of unjust enrichment (based, respectively, on unconscionability, mutual

mistake, and illegality), each alleging that it would be inequitable for the City to retain any portion of the more than $75,527,708 in rent that the Band had paid since 1994 that is in excess of "any amounts not directly tied to goods or services the City provided to the Band" during that period.  (Doc. No. 3.)

In December 2009, the City moved for summary judgment, contending that there were no genuine issues of fact that the Band breached its obligations under the 1994 Agreements by (1) unilaterally deducting the $561,047 in purported "contra-revenues" from what it otherwise would have owed the City, (2) announcing it would continue to make such deductions, and (3) adopting a resolution declaring that the Band would cease all payments to the City.  City of Duluth, 708 F. Supp. 2d at 895.  In April 2010, the Court (J. Montgomery) ruled that the 1994 Agreements–as incorporated in the Consent Order–constituted res judicata, such that they could be modified, if at all, only pursuant to a Rule 60(b) motion, which the Band had not (yet) filed.  Id. at 896-97.  The Court also concluded that–as of the time of the City's motion–"the Band has failed to demonstrate a cognizable change in the law [as] required under Rule 60(b) and [the Supreme Court's decision in] Rufo."  Id. at 900.  The Court further ruled that fact issues precluded summary judgment on the propriety of the Band having withheld "contrarevenues."  Id. at 902.  Finally, the Court rejected the City's argument that it was entitled as a matter of law to the alternative remedy of accelerated damages for the Band's failure to make its payments for the Extension Term beginning April 1, 2011.  Id. at 903.

The Band then sought review of the 1994 Agreements by the NIGC.  The NIGC

granted review.   By Order dated May 13, 2011, the Court denied the Band's request for a

continuance pending the completion of the NIGC's review, and ordered the parties to

submit to binding arbitration the issue of the amount of rent for the twenty-five year

Extension Term of the Agreements.  (Doc. No. 179 (adopting Report and

Recommendation, Doc. No. 178).)  A trial was scheduled to commence on July 26, 2011.

Shortly after those arbitration proceedings commenced, the NIGC, on July 12,

2011, issued a Notice of Violation ("NOV"), concluding that the 1994 Agreements

violated the IGRA's mandate that the Band retain "sole proprietary interest" in and

"responsibility for" its gaming activity.  The NIGC thus ordered the Band to cease

performance under the 1994 Agreements or face sanctions, including fines and the

possible closure of the casino.

The Band promptly informed this Court of the NOV as well as of its intent to

therefore move for relief from the consent decree.  (Doc. No. 202.)  On July 22, 2011, the

Band filed the present motion under Rule 60(b).  (Doc. No. 207.)  This Court removed the

matter from its trial calendar and promptly heard oral argument on the Band's motion.

## III.   DISCUSSION

Pursuant to Rule 60(b), the Band seeks a broad array of relief from three separate

Orders as follows:

**(1) The 1994 Consent Order:**

(a) that the Band need not resolve through arbitration the issue of the amount of

rent owed from April 1, 2011 to 2036;

(b) that the amount of rent already paid to the City between 1994 and 2009 should have been commensurate with the amount of services provided by the City;

(c) that the Band be relieved from making any further rent payments under either the Initial or the Extension Term;

(d) that the Band be allowed to modify its gaming ordinances or regulations without the City's consent;

(e) that the Band be relieved from the requirement that it provide access to, or copies of, casino records; and

(f) that the Band be permitted to conduct licensing of its casino employees free of any City input;

**(2) The April 21, 2010 Summary Judgment Order:**

(a) that the Band be relieved from paying to the City any rent otherwise due in 2009, 2010 and 2011;

(b) that the Band be relieved from paying to the City any amounts the Band has withheld from rent as "contrarevenues";

(c) that the Band be permitted to pursue its counterclaims as originally pled; and

**(3) The May 13, 2011 Order:**

(a) that the Band not be compelled to arbitrate the amount of rent to be paid to the City for the Extension Term.  (Doc. No. 207.)

In essence, the Band requests (1) to not have to arbitrate the rental rate for the second term (Requests 1(a) and 3); (2) to not have to pay rent for either the Initial Term

(Requests 1(b), part of Request 1(c), and Request 2(a)), or the Extension Term (part of Request 1(c)); (3) to be able to deduct "contrarevenues" (Request 2(b)); and (4) to not be subject to various terms of the City's control over gaming operations (Requests 1(d)-(f)).

The Court must first address, however, the City's challenge to the validity of the NOV as a proper exercise of the NIGC's statutory authority.[2]

### A.      Validity of the NOV

The City argues that the relevant provision of the IGRA does not in fact impose any "sole proprietary interest" mandate with respect to the Band's contractual agreements with the City.  (Doc. No. 209, at 21-30.)  Contending that Section 2710 governs only a

---

[2]      The City asserts eight general reasons for not awarding the Band any relief. (Doc. No. 209, at 5-6).  After a full review of the parties' arguments and the record, the Court concludes that only four merit discussion at any length here:  (1) that the "NIGC's application of its 'sole proprietary interest' theory is inappropriate and beyond the authority granted it by Congress"; (2) that "[r]elief cannot be applied retroactively"; (3) that the "required showing" under Rule 60(b) has not been made; and (4) that the "NIGC has no authority to tell the Court whether its 1994 Consent Decree is to be reopened or vacated."  (Id.)   Accordingly, the Court will not expressly address the following three arguments of the City:  (1) that the Band's lack of "clean hands" precludes any equitable relief under Rule 60(b); (2) that the "NOV itself contains such factual and legal misstatements that it does not support its own conclusions"; and (3) that the "Band cannot be allowed to avoid the Consent Decree by its own voluntary and intentional conduct, breaching the 1994 Agreements."  (Id.)  Although the Band communicated with the NIGC leading up to the NOV, the Court cannot conclude that the Band lacks the clean hands for equitable relief.  The claim that the NOV mischaracterizes the circumstances of the NIGC's 1994 approval of the Agreements, whether or not true, does not undermine the fact that the NIGC plainly changed its conclusion regarding the validity of those agreements.  And the argument that the Band ignored its contractual obligations and governing Orders of the Court does not undermine the validity of the NOV.  The City's eighth and final argument, that the "settlement of these parties must be honored by the Court," simply begs the question raised by any Rule 60(b) motion directed at a consent decree–that is, whether the grounds for the motion outweigh the finality otherwise accorded settlements and judgments.

*tribal ordinance or resolution* regarding gaming, the City asserts that "Section 2710 does not authorize the NIGC to review or police any and all *contracts* that have any relationship to Class III gaming." (Id. at 25 (emphasis added).)[3]

There seems to be no dispute that the Band may engage in Class III gaming if it is "authorized by an ordinance or resolution that" "(i) is adopted by the governing body of the Indian tribe," (ii) meets the requirement, among others, that "the Indian tribe will have the sole proprietary interest [in] and responsibility for the conduct of any gaming activity," and "(iii) is approved by the Chairman" of the NIGC. 25 U.S.C. § 2710(b), (d). Moreover, it also seems clear that (1) Congress enacted the IGRA to promote and regulate gaming on tribal lands for the benefit of the tribes, 25 U.S.C. §§ 2701, 2702; and (2) the Chairperson of the NIGC has the authority to "approve tribal ordinances or resolutions regulating class II gaming and class III gaming as provided in section 2710," and also to impose fines on, and order the temporary closure of, Indian casinos for

---

[3]       The City further observes that the NIGC has never promulgated any regulation defining "sole proprietary interest." (Id. at 25-27.) And asserting that the NIGC's understanding of that term is "a work in progress," the City contends that the agency's shifting understanding of that term does not constitute the requisite "change in statutory or decisional law." (Id. at 27, 29.) But (1) an agency may develop a definition of a term through the process of individual adjudications, NLRB v. Weingarten, 420 U.S. 251, 265 (1975) ("The use by an administrative agency of the evolutional approach is particularly fitting. . . . The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process."); and (2) an agency may change its view on an issue within its statutory authority, NLRB v. Iron Workers, 434 U.S. 335, 351 (1978) ("An administrative agency is not disqualified from changing its mind."). Here, despite the NIGC's initial position, more recently it has developed and applied its understanding of the "sole proprietary interest" mandate with greater precision and consistency. (Doc. No. 202, at 16 ([S]ince 2003 the OGC issued over 50 legal opinions analyzing the mandate.").)

violations of applicable law, id. §§ 2705, 2713.  Accordingly, Congress plainly delegated to the NIGC the authority to review and approve (or disapprove) tribal gaming ordinances and resolutions.

Here, the Band not only enacted its Gaming Resolution, but also entered into the 1994 Agreements with the City in order to operate the casino.  But this Court concludes that such an arrangement does not thereby remove the 1994 Agreements from the NIGC's authority to review and approve tribal gaming.

The City relies mainly on the Ninth Circuit's decision in Guidiville Band of Pomo Indians v. NGV Gaming, Ltd., which ruled that Section 2710 "simply does not speak to *contracts* entered into between a tribe and a third party (as contrasted with tribal legislation or regulations officially enacted by the tribe)."  531 F.3d 767, 782-83 (9th Cir. 2008) (concluding that "the Tribe's agreement with NGV cannot be said to violate Section 2710").[4]  The court noted that there was no tribal ordinance or resolution in that case.  Id.

Here, in contrast, the Band promulgated Resolution # 09-93 (the "Gaming Resolution") on June 28, 1993, and amended it on August 24, 1993.  The NIGC approved that resolution on September 23, 1993.  More importantly, the umbrella agreement

---

[4]      The Band claims the City's reliance on Guidiville Band "just doesn't make sense."  (Doc. No. 227, at 11.)  Yet the Band states that the Ninth Circuit "was correct that the statute doesn't require a tribe to include the sole-proprietary-interest requirement in contracts; its requires them to put the requirement in the gaming ordinances or resolutions."  (Id. at 12.)  Nevertheless, the Band argues that "it is nonsensical to suggest that a tribe could evade the sole-proprietary-interest requirement by granting a proprietary interest in its gaming activity to an outside party in a contract rather than in its tribal ordinance."  (Id.)

between the parties, which references and attaches the remaining 1994 Agreements, states that under 25 U.S.C. § 81, "[t]his Agreement is subject to the approval of the United States Department of Interior, Bureau of Indian Affairs."  (Doc. No. 12-1, § 16.b.) Moreover, the parties recognized the need for approval from the NIGC because the 1994 Sublease and Assignment of Gaming Rights Agreement, which is "Exhibit A" to the umbrella agreement and one of the main components of the overall transaction, provides that it is effective upon, *inter alia*, "approval by the Secretary of the Interior . . ., and the issuance of a separate letter from the Chairman of the National Indian Gaming Commission indicating that the Sublease and the Related Documents are in compliance with the Indian Gaming Regulatory Act."  (Doc. No. 12-2.)

The Court concludes that, under the particular circumstances at issue here, the City thus may not now argue that the 1994 Agreements–which have governed the parties' business relationship for the last seventeen years–evade the reach of the NIGC's statutory authority, particularly where the City, in reliance on the NIGC's earlier approval of the deal, enjoyed many years of rental income and other benefits.  See Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 131 (2d Cir. 2008) (relying on fact that (1) the agency had determined that it had authority to approve agreements, (2) the parties treated the agreements "as being subject to agency approval," and (3) the "contracts themselves contemplated agency approval").  Accordingly, the NIGC's 2011 NOV is a valid exercise of its regulatory authority.

The court thus turns to the issue of whether the 2011 NOV warrants any of the

relief the Band seeks.  As relevant here, a party may move for relief from a final

judgment, order or proceeding for the following reasons:  "(5) the judgment has been

satisfied, released or discharged; it is based on an earlier judgment that has been reversed

or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that

justifies relief."  Fed. R. Civ. P. 60(b)(5)-(6).[5]

### B.      Relief Under Rule 60(b)(5)

Although the Band now attempts to obtain relief from three separate Orders, all of

the obligations that the Band now challenges emanate from the parties' 1994 Agreements

that were incorporated into the Court's 1994 Stipulation and Consent Order.  Although a

"consent decree no doubt embodies an agreement of the parties and thus in some respects

is contractual in nature," it is, nonetheless, "an agreement that the parties desire and

expect will be reflected in, and be enforceable as, a judicial decree that is subject to the

rules generally applicable to other judgments and decrees."  Rufo v. Inmates of the

Suffolk County Jail, 502 U.S. 367, 378 (1992).

### 1.      Rule 60(b)(5) Standard

With respect to Rule 60(b)(5), there is no contention that the judgment has been

satisfied, released or discharged, or that it is based on a now-reversed or -vacated earlier

judgment.[6]  Accordingly, any potential relief under that provision would be confined here

---

[5]      The Band confines the basis for its motion to these specified grounds.

[6]      Contrary to the Band's suggestion (Doc. No. 227, at 28), the fact that the
2011 NOV conflicts with the 1994 Consent Order does not, of course, mean that the 1994
Order has been reversed or vacated.

to situations where applying the 1994 Consent Decree "prospectively is no longer equitable."[7]

The parties are not entirely in agreement regarding the governing standard for modification.  The Band relies exclusively on Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 380 (1992), an "institutional reform" case, whereas the City asserts that courts have applied two different standards, that of Rufo as well as that of United States v. Swift & Co., 286 U.S. 106, 119 (1932).  In White v. Nat'l Football League, the Eighth Circuit noted a dispute as to whether the Rufo standard "is limited to institutional reform cases or whether it applies to Rule 60(b)(5) motions in other contexts," but found it unnecessary to resolve the question.  585 F.3d 1129, 1136 n.4 (8th Cir. 2009).  In Horne v. Flores, the Supreme Court clarified that institutional reform cases are not confined to constitutional claims but rather extend to federal statutory claims, for example, where the orders of a federal court, "[f]or nearly a decade," have "substantially restricted the ability of [a State] to make basic decisions regarding educational policy, appropriations, and budget priorities," and "some state officials have welcomed the involvement of the federal courts as a means of achieving appropriations objectives that could not be achieved through the ordinary democratic process."  ___ U.S. ___, 129 S. Ct. 2579, 2593 & n.3 (2009).  Such "institutional reform injunctions often raise sensitive federalism concerns" insofar as they involve "areas of core state responsibility, such as public

_____

[7]      Because the three specified grounds for relief under Rule 60(b)(5) are independent alternatives, relief may be warranted if applying the judgment prospectively "'is no longer equitable,'" "even if" the movant has "not 'satisfied' the original order.'"  Horne v. Flores, ___ U.S. ___, 129 S. Ct. 2579, 2597 (2009).

education." Id. at 2593.  But here, although the Band seeks to vindicate its statutory right to the "sole proprietary interest" in its casino, the existing federal consent decree does not require the City to appropriate more funds than it likely otherwise would have spent. Rather, the existing Consent Order here has resulted in the City *obtaining* substantial revenues from the Band's operation of the casino.  Thus, it is far from clear that the present dispute constitutes, or is analogous to, an institutional reform case such as Horne or Rufo.

In United States v. Swift & Co., an antitrust action, the Supreme Court ruled–although several years before the adoption of the Federal Rules of Civil Procedure–that "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned."  286 U.S. 106, 119 (1932).  But as the Supreme Court clarified in Rufo, there is "little basis for concluding that Rule 60(b) misread the *Swift* opinion and intended that modifications of consent decrees in all cases were to be governed by the standard actually applied in *Swift*."  502 U.S. at 380.  Rule 60(b)(5), "in providing that, on terms as are just, a party may be relieved from a final judgment or decree where it is no longer equitable that the judgment have prospective application, permits a less stringent, more flexible standard."  Id.

Although the parties seem to view Swift and Rufo as articulating two separate–and largely irreconcilable–standards, this Court agrees with the observation of the First Circuit that

> [w]hile *Rufo* was a case involving institutional reform, we do not read it as being confined in principle to such cases.  In our view, Rule 60(b)(5) set forth the umbrella concept of "equitable" that both *Swift* and *Rufo* apply to particular, widely disparate fact situations.

Alexis Lichine & CIE v. Sacha A. Lichine Estate Selections, Ltd., 45 F.3d 582, 586 (1st

Cir. 1995) ("We view this not as a limited dualism but as polar opposites of a continuum

in which we must locate the instant case.").[8]  Accord Rufo, 502 U.S. at 379 (noting

"traditional flexible standard for modification of consent decrees"); City of Duluth v.

Fond du Lac Band of Lake Superior Chippewa, 708 F. Supp. 2d 890, 896 (D. Minn.

2010) ("The standard that must be met to warrant reopening a consent decree pursuant to

---

[8]       The oft-quoted standard of Swift–that modification of a decree is limited to cases of a clear showing of grievous wrong–thus must be confined to its context.  Bd. Of Educ. Of Oklahoma City Public Schools v. Dowell, 498 U.S. 237, 248 (1991) (ruling that lower court erred in relying on the standard of Swift, which "does not provide the proper standard to apply to injunctions entered in school desegregation cases").  "When the beneficiary of an injunction seeks relief to achieve the purposes of the provisions of the decree,'" the court may modify that decree "'to achieve the required result.'"  Salazar v. Buono, ___ U.S. ___, 130 S. Ct. 1803, 1831-32 (2010) (Stevens, J., dissenting) (quoting United Shoe Machinery, 391 U.S. at 249, 252).  But "[i]n Swift, the defendants sought relief not to achieve the purposes of the provisions of the decree, but to escape their impact."  United States v. United Shoe Machinery Corp., 391 U.S. 244, 249, 247-48 (1968) (holding that Swift "in no way restricts the District court's power to grant" the Government's request for modification of decree that imposed a variety of restrictions and conditions on company that violated the Sherman Act where the decree had allegedly failed to achieve competition).  Here, however, in contrast to many of the Supreme Court cases addressing modification of consent decrees, including Swift, the present action arises from a consensual agreement for the operation of a casino.  City of Duluth v. Fond du Lac Band of Lake Superior Chippewa, 708 F. Supp. 2d 890, 893 (D. Minn. 2010) ("This dispute arises out of a business relationship between the City and the Band that began in the 1980s.").  Thus, there is no "beneficiary" of the consent decree as there would be where a consent decree was issued in favor of, for example, inmates challenging the unconstitutionality of the conditions of their confinement, or parents seeking the desegregation of their children's schools.  Rather, both the City and the Band benefitted financially from the 1994 Agreements and Consent Order.

Rule 60(b) is a 'flexible standard' that involves considerations of equity and requires a showing 'that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstances.").

A consent decree is subject to Rule 60(b) the same as any other judgment or decree. Rufo, 502 U.S. at 378. The standard for modification of a consent decree is a flexible one, but modification will not therefore "be warranted in all circumstances." Id. at 383 (noting that mere inconvenience of abiding by terms of decree is not enough). "[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." Id. If this standard is met, "the court should consider whether the proposed modification is suitably tailored to the changed circumstance." Id.[9]

---

[9]     The movant "may meet its initial burden by showing either a significant change either in factual conditions or in law." Id. at 384. With respect to factual changes, modification "may be warranted when changed factual conditions make compliance with the decree substantially more onerous." Id. "Modification is also appropriate when a decree proved to be unworkable because of unforeseen obstacles, or when enforcement of the decree without modification would be detrimental to the public interest." Id. (internal citations omitted). But modification is not limited to circumstances where a change in facts "is both 'unforeseen and unforeseeable.'" Id. at 385 ("Litigants are not required to anticipate every exigency that could conceivably arise during the life of a consent decree."). Nevertheless, modification ordinarily "should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." Id. With respect to changes in the law, "[a] consent decree must of course be modified if, as it later turns out, one or more of the obligations placed upon the parties has become impermissible under federal law." Id. at 388. But "[t]o hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiations of settlements in institutional reform litigation." Id. at 389. "While a decision that clarifies the law will not, in and of itself, provide a basis for modifying a decree, it could constitute a change in circumstances that would support
continue...

## 2.    Relief From The 1994 Consent Decree

The Band seeks relief from the Consent Order (and the 1994 Agreements it incorporated) based on the 2011 NOV.  "When prospective relief is at issue, a change in decisional law provides sufficient justification for Rule 60(b)(5) relief."  The Prudential Ins. Co. v. Nat'l Park Medical Center, Inc., 413 F.3d 897, 903 (8th Cir. 2005).  In direct contrast to the NIGC's original approval of the 1994 Agreements, the July 12, 2011 NOV plainly concludes that the terms of the agreement between the parties violate the IGRA, and directs the Band to cease complying with the violative provisions.  Although the underlying statute remains the same, the NIGC clearly has changed course on whether the particular terms of the 1994 Agreements satisfy the IGRA.  The Court finds that this change in agency position or interpretation constitutes a change in the law that could warrant relief under Rule 60(b)(5).[10]

In Agostini v. Felton, 521 U.S. 203 (1997), the Supreme Court ruled that a change in Establishment Clause law warranted relief under Rule 60(b)(5).  In its 1985 decision in Aguilar v. Felton, the Supreme Court had held that the Establishment Clause barred city education officials from sending public school teachers into parochial schools to provide

---

[9]...continue
modification if the parties had based their agreement on a misunderstanding of the governing law."  Id. at 390.

[10]    The Band contends that its "motion is not based on a change in the law.  It is based on a change of factual circumstance, a separate and independent ground for relief under Rule 60(b)(5)."  (Doc. No. 227, at 27.)  Although this Court views the 2011 NOV as a change in the law, the result would likely be the same if the NOV were viewed as a change in factual circumstances.

remedial education mandated by a federal statute.  After a federal district court entered a

permanent injunction reflecting that ruling, parents of the parochial school's children

sought relief from that injunction.  In Agostini, the Court ruled that its intervening cases

had undermined the assumptions upon which its earlier decision in Aguilar (and another

Establishment Clause decision) relied.  521 U.S. at 222.  The Court acknowledged that

the "general principles" had not changed but that its understanding of the criteria used to

assess whether aid to religion has an impermissible effect had changed.  Id. at 223.

In the present context, the NIGC's understanding of the "sole proprietary interest"

requirement under the IGRA has not only changed, but changed sufficiently to result in

an agency opinion that is directly contrary to its earlier opinion on whether the 1994

Agreements comply with the IGRA.[11]

---

[11]     In the Court's Summary Judgment Order, Judge Montgomery rejected the
Band's earlier argument–based on various NIGC opinion letters issued before the 2011
NOV–that the law had changed because such letters were mostly advisory opinions issued
in other disputes.  Judge Montgomery further noted that "[t]he differences between the
role of an agency and the role of the courts reinforces the conclusion that a change in an
agency's interpretation of the law is not the same as a change in the court's interpretation
of the law."  708 F. Supp. 2d at 901.  This Court does not understand the Summary
Judgment Order to thereby preclude this Court from concluding that the requisite change
in the law has occurred now that the NIGC has issued its 2011 NOV.  As Judge
Montgomery concluded

> [i]t may be that the arrangement between the Band and the City violates the
> IGRA in the eyes of the NIGC.  But until the NIGC initiates an enforcement
> action regarding the Fond du Luth Casino and proceeds with that action to a
> final decision on the substantive issue of proprietary interest, this Court's
> view would constitute an advisory opinion.

708 F. Supp. 2d at 901-02.  The NIGC, of course, has now issued that final decision
regarding "sole proprietary interest" and it is squarely contrary to the agency's earlier
                                                                        continue...

Yet the City argues that "[q]uite simply, there has not been a change of law," because the "NIGC has not formally adopted any definition of the 'sole proprietary interest' theory," nor "any rules, regulations, or even guidelines."  (Doc. No. 209, at 17.) The City's position is largely untenable.  As discussed above, the NIGC is not confined to defining statutory terms through such formal means, but rather may define a term through its application in particular disputes.  <u>NLRB v. Weingarten</u>, 420 U.S. 251, 265 (1975). And the fact that the agency changed its position is, of course, not necessarily a cause for concern.  <u>NLRB v. Iron Workers</u>, 434 U.S. 335, 351 (1978) ("An administrative agency is not disqualified from changing its mind.").

The NOV found that "the 1994 Agreements violate IGRA" "[b]ased on NIGC's application of the sole proprietary interest requirement."  (Doc. No. 202, at 5.)  The NOV explained that "NIGC's application of the sole proprietary interest requirement essentially examines three criteria: 1) the term of the relationship; 2) the amount of revenue paid to the third party; and 3) the right of control provided to the third party over the gaming activity."  (<u>Id.</u>; <u>see id.</u> at 16 (explaining that "since 2003 the OGC has issued over 50 legal opinions analyzing" the sole proprietary interest mandate according to those criteria).)

The NOV's overall conclusion appears to be based on these criteria in the aggregate.  As the NOV explained, "[w]hile the percentage of income paid to the City is an important factor . . ., it is not the only factor.  A reduction in the fee will not remedy fees paid over the last 17 years, the additional twenty-five year term and the regulatory

_____

[11]...continue
approval of the 1994 Agreements.

responsibility and control issues." (Id. at 11; see id. at 13-14 ("IGRA's sole proprietary interest mandate is violated by the high amount of revenue being conveyed to the City, the length of the term of the 1994 Agreements, and the City's right of control over the regulation of the gaming under the 1994 Agreements.").)[12]

The NOV thus evaluated the validity of the 1994 Agreements as a whole and found that the parties' agreement violates the IGRA.  Accordingly, it would be difficult, if not impossible, to isolate individual objections that the NIGC had to particular aspects of the overall deal.  Although the NOV takes serious issue with (1) the $75 million of "rent" that the Band already has paid the City, (2) the forty-two year length of the entire agreement, and (3) the City's control over several aspects of casino management, the NIGC's decision is a single conclusion regarding the entirety of the parties' relationship, not individual objections to particular aspects of the various agreements.

The Court having concluded that the agency's decision constitutes a change in the governing law for purposes of Rule 60(b)(5),[13] the question becomes what particular

_____

[12]     Granted, the NOV arguably suggests that certain elements of the 1994 Agreements, standing alone, would violate the IGRA regardless of any other elements. For example, with respect to the regulatory responsibility and control over the casino, the NOV states that "[o]ne of the primary purposes of IGRA is to provide a statutory basis for tribes to regulate their own gaming activity. . . .  Thus, the City's power to directly control the regulation of the Band's gaming activity infringes on the Band's authority as confirmed by Congress.  Accordingly, the Band does not retain the sole proprietary interest in, and responsibility for, the gaming activity." (Id. at 11.)  Similarly, the NOV found that the level of the City's right to access the Band's records of the gaming operation "is unusual considering that IGRA does not grant the City _any_ role in the regulation of Indian gaming." (Id.)

[13]     Contrary to the Band's suggestion (Doc. No. 227, at 21), the agency's

continue...

relief this Court should grant.  The present dispute arises roughly concurrent with the end

of the first period of the 1994 Agreements (1994-2010), and while the parties were in the

process of deciding the rate of rent to apply during the second period (2011-2036).  The

bulk of the present dispute concerns the amounts the Band is obligated, under the 1994

Agreements, to pay the City.  Although those agreements recognize two separate periods

of contractual performance (one from 1994 to 2011 and the other from 2011 to 2036), the

Band's withholding of payment starting in 2009 effectively divides the first period into

two, creating three periods:  (1) 1994-2008, (2) 2009-2011, and (3) 2011-2036.  With

respect to the first period, the Band already has paid the City in satisfaction of the bulk of

its obligation under the Initial Term, but seeks the return of the bulk of those funds.  With

respect to the second period, the Band is withholding payment even though its obligation

already became due and owing for 2009, 2010 and 2011.  With respect to the third period,

the existing Consent Order provides a process by which the parties shall determine the

rental rate for the second term, culminating, if the other means prove unsuccessful, in

arbitration.

---

[13]...continue

change in position does not raise any issue of the illegality of a contract.  In terms of
contract law, the 1994 Agreements were not illegal when made.  "If an agreement is
illegal when made, the issue is illegality.  If an agreement that is legal when made later
becomes illegal, the issue is supervening impossibility.  Lawful performance becomes
impossible."  Joseph M. Perillo, Calamari and Perillo on Contracts § 13.5 (6th ed. 2009).
See generally Restatement (Second) of Contracts §§ 261, 264 (articulating general
principle of supervening impracticability and particular context of "prevention [of
performance] by governmental regulation or order").  Here, while performance was
lawful from 1994 until the NIGC's 2011 decision, further performance of the bulk, if not
the entirety, of the 1994 Agreements would be unlawful.

### (a)       Prospective Relief:  2011-2036

The Court first addresses the Band's request to be relieved from its future

obligations during the Extension Term, including its obligation to pay rent as well as its

obligation to arbitrate the rate of rent during that term.  Putting aside for the moment the

arbitration obligation, the Court concludes that because it is impossible to reconcile the

terms of the 1994 Agreements and the NOV, thereby rendering any remaining

performance of the contractual terms legally impracticable, the Band and the City are

relieved of any further prospective compliance with their obligations under the 1994

Agreements and Order.  If the parties choose to enter into a new contractual relationship

in the future, its terms will need to comply with the NOV.  If the Band chooses to operate

the casino on its own, it may do so.[14]

---

[14]       The IGRA, although regulating the parameters of Indian gaming, certainly
does not compel the Band to operate this, or any other, gaming business.  And, in fact, the
1994 Agreements do not compel the Band to continue to operate this gaming business.
The Sublease provides that

> [t]he Band shall have the unilateral right, at its sole discretion, at any time,
> to cease gaming activities at the Sublease space and shall be liable for all
> debts and operating costs incurred or assumed by the Band pursuant to this
> Sublease up to the time of terminating such activities, but shall incur no
> additional liability solely as a result of exercising its option to terminate all
> gaming activities at the Sublease space.

(Doc. No.  12-2, § 12.1.)  Moreover,

> [t]his Sublease shall be terminated if the Band exercises its option to cease
> gaming activities at the Sublease space, and in the event the Sublease is
> terminated, the Band shall have no further liability whatsoever to the City
> or the Commission, including any continuing liability for Rent Item No. 1
> or Rent Item No. 2 hereunder.

continue...

21

With respect to the arbitration provision, although the NOV did not object to it *per se*, the Band does.  The 1994 Agreements provide that if negotiations between the City and the Band regarding the rate of rent for the Extended Term prove unsuccessful by June 30, 2010, the parties are to "meet with the NIGC for mediation," and that if mediation does not resolve the issue by October 1, 2010, "they are to submit the dispute to binding arbitration."  City of Duluth, 708 F. Supp. 2d at 903.  The arbitration proceedings, which had just begun, were halted upon the issuance of the NOV.

There is a strong federal policy favoring agreements to arbitrate.  Congress enacted the FAA to ensure that arbitration agreements were enforced by the courts, the same as any other contract.  E.g., Vaden v. Discover Bank, 556 U.S. 49, __, 129 S. Ct. 1262, 1271 (2009).  The FAA thus reflects a policy of favoring agreements to arbitrate and strictly enforcing them according to their terms.  Id. ("Congress enacted the FAA . . . to declare 'a national policy favoring arbitration' of claims that parties contract to settle in that manner.").

But arbitration remains a matter of consent and "is simply a matter of contract between the parties; it is a way to resolve those disputes–*but only those disputes*–that the parties have agreed to submit to arbitration."  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) (emphasis added).  The pro-arbitration policy of the FAA is not a license to interpret arbitration agreements beyond the clear limits of the plain language of the parties' contract because the FAA, which "places arbitration agreements on an

---

[14]...continue
(Id.)

equal footing with other contracts," simply "requires courts to enforce them *according to their terms*."  Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772, 2776 (2010) (emphasis added).

Here, the parties did not agree to any broad arbitration provision, such as one providing that "any and all disputes arising out of or relating to" their agreement were to be resolved by arbitration.  Rather, the arbitration provision at issue is narrow, well-defined and contingent:

> [O]n or before January 1, 2010 the Band and the City shall meet and shall negotiate in good faith concerning the percentage of gross revenues . . . the City shall receive for the 25 year term commencing April 1, 2011.  If the parties have not reached agreement by June 30, 2010 the Band or the City may request the Chairman of the [NIGC] to mediate . . . for purposes of attempting to bring the parties to agreement.  If the . . . Chairman of the [NIGC] refuses to mediate . . . or if no agreement is reached by midnight October 1, 2010, the Band and the City shall submit the dispute to binding arbitration under the arbitration clause of Paragraph 10 of the Tribal-City Accord.

(Doc. No. 12-2, § 4.2.2.5.)  Paragraph 10 of the Tribal-City Accord simply provides that "[w]henever arbitration is *specifically* called for in this Accord or the Sublease," the parties shall arbitrate the particular dispute.  (Doc. No. 12-3, ¶ 10 (emphasis added).)

That the parties did not intend to arbitrate all issues arising out of any dispute regarding the 1994 Agreements is confirmed by the fact that (1) their settlement of the dispute, which resulted in the 1994 Agreements, was not simply a private settlement but rather was approved by the Court in its Consent Order, which expressly provided that "[t]he Court retains jurisdiction over this matter, including specifically the 1994 Agreements, for the purpose of ensuring the obligation of the parties to comply with all

provisions of the 1994 Agreements" (Doc. No. 11-7), and (2) the 1994 Agreements provided that "disputes between the City and the Band arising under this Agreement and the Exhibits hereto," that is, the various sub-agreements including the Sublease, "shall be heard in United States District Court for the District of Minnesota." (Doc. No. 12-1, § 11.) Moreover, the Sublease provides that disputes that are not resolved by good faith negotiations may be resolved by filing "an action in the federal district court for the District of Minnesota," and that if either party defaults on its obligations under the Sublease or is "otherwise in breach of any Related Document," and they are unable to cure the default, "the complaining party may commence an action against the offending party in the United States District Court for the District of Minnesota and seek appropriate relief." (Doc. No. 12-2, §§ 4.5, 13.1.)

The arbitrators were thus authorized to resolve only the issue of the *rate* of Rent Item 2, not the length of the Extension Term, which the parties already had agreed would be twenty-five years, or any other issue. Although the total length of the period was a factor in support of the NIGC's decision, the agency concluded that the parties' overall agreement, not just the rate of rent, violates the IGRA. In such circumstances, it makes no sense to compel the parties to continue with the arbitration of the rate of rent when that is only a single variable in the overall question of what arrangement, if any, would satisfy the NIGC. In any attempt to restructure the parties' agreement so that it would comply with the IGRA and the 2011 NOV, the individual variables of their agreement–mainly the rate of rent, the length of the Extension Term, and the control exercised by the

City–cannot be addressed separately.  Accordingly, the Court relieves the Band from its

contractual obligation to arbitrate the rate of rent for the Extension Term, as well as from

the May 13, 2011 Order compelling arbitration over the amount of rent to be paid to the

City for that second term.

(b)      **Retroactive Relief:  1994-2011**

The NOV concluded that, in order to correct the violations of the IGRA that it

found, "[t]he Band must cease performance" of any provision of the Agreements that

violated the IGRA, and further stated that "[t]his applies to the *entire 42 year term* of the

1994 Agreements," that is, not only the Extension Term scheduled to begin on April 1,

2011, but also the entirety of the now-completed, seventeen-year Initial Term.  (Doc. No.

202, at 21 (emphasis added).)

Pursuant to its Rule 60(b) motion, the Band thus seeks, *inter alia*, to "pursue its

counterclaims as originally pleaded."  (Doc. No. 207, at 3.)  Those counterclaims allege

that the City has been unjustly enriched by its receipt of "more than $75,527,708 in rental

and other payments under the 1994 Contracts," an amount that the Band alleges grossly

exceeds the value of any benefits the Band received from the City.  (Doc. No. 3, ¶¶ 36, 43

& 49.)  The Band also seeks to be relieved from its obligation to pay the City the "rent"

for 2009 through 2011, which it has withheld.  The Band thus seeks to recover the bulk, if

not the entirety, of the funds it in fact paid the City annually from 1994 through 2009, and

the funds the Band, under the 1994 Agreements, should now have paid through 2011.

Although the NOV is a final agency decision generally entitled to deference, the

NIGC's decision does not *require* the Court to grant the Band all of the relief it seeks.

There is no legal obligation on this Court, whether under Rule 60(b) or otherwise, to grant

relief commensurate with what the NIGC would find approvable under the IGRA.  With

respect to the NOV itself, an agency may not–consistent with the separation of powers

doctrine–"take action that would effectively vacate a court's final judgment."  City of

Duluth v. Fond du Lac Band of Lake Superior Chippewa, 2011 WL 721107, *5 (D. Minn.

Jan. 5, 2011), adopted by 2011 WL 721246 (D. Minn. Feb. 22, 2011).  As the City

contends, the "NIGC has no authority to tell the Court whether its 1994 Consent Decree is

to be reopened or vacated."  (Doc. No. 209, at 6.)  In short, "the NIGC cannot unilaterally

abrogate the 1994 Consent Decree," which, of course, is a final judgment of the Court.

Id.  That decision is solely for this Court, and one governed by Rule 60(b).  Rule 60(b)(5)

is confined by its terms, however, to prospective relief.  The Band acknowledges as

much.  (Doc. No. 227, at 17 n.62.)

Moreover, unlike the many Rule 60(b) "institutional reform" cases concerning

issues such as desegregation, inmate rights, or the rights of disabled children, the present

action is not one brought by a victim alleging that a wrongdoer violated any of the

victim's fundamental rights.  Rather, it emanates from a consensual business transaction

that has financially benefitted both parties.  Under such circumstances, the Court could

not equitably permit the Band to rewrite that agreement so as to allow it to recoup rent

payments already made.

Although the Band asserts that "the NOV makes clear that it applies

26

prospectively," the Band nevertheless argues that the NOV "directs prospective correction of a past wrong." (Doc. No. 227, at 15-16.) Thus, while claiming that "the NOV itself is purely prospective, . . . the Band has requested that the Court order both future- and past-looking relief" pursuant to the Federal Rules of Civil Procedure. (Id. at 16.) But as explained above, the Band may not obtain, pursuant to Rule 60(b)(5), retroactive relief from any obligation under the 1994 Agreements that it already has performed or avoid any obligation that it already should have performed. Accordingly, the Band may not withhold from the City the proper amount of rent due and payable for any portion of the now-completed Initial Term.

In sum, the only valid outstanding dispute with respect to the Initial Term is thus the propriety of the Band's withholding of the disputed contra-revenues, an issue that will be resolved at trial.

## C.     Relief Under Rule 60(b)(6)

In addition to Rule 60(b)(5), one of the five specified bases for relief from a judgment or order, the Band also invokes the "catch-all" provision of Rule 60(b)(6). Under that provision, a court may provide "relief from a final judgment, order or proceeding for . . . (6) any other reasons that justifies relief." Fed. R. Civ. P. 60(b)(6). It "permits reopening when the movant shows 'any . . . .reason justifying relief from the operation of the judgment' other than the more specific circumstances set out in Rules 60(b)(1)-(5)." Gonzalez v. Crosby, 545 U.S. 524, 528-29 (2005).

Here, while recognizing that Rule 60(b)(5) "is limited to prospective relief," the

Band contends that Rule 60(b)(6) "isn't."  (Doc. No. 227, at 17 n.62.)  But a party seeking

relief under Rule 60(b) may not employ Rule 60(b)(6) simply to evade the limits on relief

that, but for the applicable limit, would be available under Rule 60(b)(1)-(5).  The

remainder of the relief the Band presently seeks consists of its request to recoup the bulk,

if not the entirety, of the rent payments it already has made to the City during the Initial

Term.  But having rejected such retroactive relief pursuant to Rule 60(b)(5), the Court

declines to open any escape hatch that would permit such relief under Rule 60(b)(6).

Although Rule 60(b)(6) is textually open-ended, this Court doubts that Congress imposed

specific limits on relief under Rule 60(b)(5) (or any of the other specific Rule 60(b) bases

for relief), only to then allow a movant to circumvent such limitations simply by

requesting that same relief under Rule 60(b)(6).

The Band argues that the 1994 Agreements required it to pay rent for use of

property it owned and that the amount of such rent was grossly excessive compared to

what it received from the City in terms of goods or services.  But the Court cannot

conclude that justice requires or warrants such relief where the Band agreed to those

terms, and the NIGC approved the parties' deal in 1994.  In short, at the time those

agreements were entered into, they were legal under the NIGC's then-existing

understanding of IGRA.  Moreover, the fact that the Band now believes the 1994

Agreements were unfair is no basis to retroactively invalidate those agreements.  A bad

bargain perhaps, but one that the Band entered into without coercion.  Finally, ordering

the City to return seventeen years of funds that it received in good faith–and, of course,

already has spent on public services–would hardly be equitable.

## III.    ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendant's motion for relief under Rule 60(b) [Doc. No. 207] is **GRANTED IN PART** (insofar as it requests that the Band be relieved of any further compliance with its obligations under the 1994 Agreements) and **DENIED IN PART** (insofar as it requests retroactive relief, including relief from payments due the City for the years 2009-2011 and including the right to pursue its counterclaims seeking, in effect, the refund of any portion of rent already paid to the City in excess of municipal services provided); and

2.    The parties shall contact the Court's Chambers to schedule a trial confined to the issue of the Band's retention of the disputed "contra-revenues," and the Court will then rule on the amount owed by the Band to the City for rent it has withheld for 2009, 2010 and 2011.


Dated:  November 21, 2011                           s/ Susan Richard Nelson
                                                    SUSAN RICHARD NELSON
                                                    United States District Judge