## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| City of Duluth, | Case No. 09-cv-2668 (SRN/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Fond du Lac Band of Lake Superior Chippewa, | |
| Defendant. | |

David P. Sullivan, 717 Sunset Cove, Madeira Beach, FL 33708; Gunnar B. Johnson and M. Alison Lutterman, City of Duluth, 410 City Hall, 411 West First Street, Duluth, MN 55802; Robert C. Maki and Shawn B. Reed, Maki & Overom Limited, 31 West Superior Street, #402, Duluth, MN 55802, for Plaintiff.

Vanya S. Hogen, Jessica Intermill, and Henry M. Buffalo, Jr., Jacobson, Buffalo, Magnuson, Anderson & Hogen, P.C., 335 Atrium Office Building, 1295 Bandana Boulevard, Saint Paul, MN 55108; Dennis Peterson, Fond du Lac Band of Lake Superior Chippewa Legal Affairs Office, 1720 Big Lake Road, Cloquet, MN 55720, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on remand from the United States Court of Appeals for the Eighth Circuit.  The Eighth Circuit reversed this Court's earlier denial of Defendant's request for retrospective relief under Rule 60(b)(6) and remanded that question for further proceedings.  City of Duluth v. Fond du Lac Band of Lake Superior Chippewa, 702 F.3d 1147, 1156 (8th Cir. 2013).  Defendant filed a motion for relief

under Rule 60(b)(6), [Doc. No. 260], which Plaintiff opposed, [Doc. No. 269].  Also

before the Court is Plaintiff's motion to stay proceedings on remand pending the

disposition of an action brought by Plaintiff under the Administrative Procedures Act.

[Doc. No. 255].  For the reasons set forth below, the Court denies Defendant's Rule

60(b)(6) motion and denies Plaintiff's motion to stay as moot.

## II.   BACKGROUND

In 1986, Plaintiff City of Duluth ("City") and Defendant Fond du Lac Band of

Lake Superior Chippewa ("Band") entered into a joint venture to create and operate a

casino in downtown Duluth, Minnesota.[1]  In 1988, Congress passed the Indian Gaming

Regulatory Act ("IGRA"), which requires that Indian tribes have "sole proprietary

interest" in and exclusive control of any Indian gaming activity authorized by the Act.  25

U.S.C. § 2710(b)(2)(A).

In 1989, the Band filed suit in federal court (Case No. 5-89-0163), seeking a

declaration that the 1986 Agreement with the City violated the IGRA's requirement that

an Indian tribe "have the sole proprietary interest and responsibility for the conduct of

any gaming activity" on Indian lands.  In 1990, United States District Judge Paul A.

Magnuson dismissed the Band's action without prejudice, explaining that "the public

interest is best served by allowing the Federal regulatory authority established by the

---

[1] For a more complete recitation of the facts, see City of Duluth v. Fond du Lac Band of Lake Superior Chippewa, 702 F.3d 1147 (8th Cir. 2013); City of Duluth v. Fond du Lac Band of Lake Superior Chippewa, 830 F. Supp. 2d 712 (D. Minn. 2011); City of Duluth v. Fond du Lac Band of Lake Superior Chippewa, 708 F. Supp. 2d 890 (D. Minn. 2010); City of Duluth v. Fond du Lac Band of Lake Superior Chippewa, No. 9-2668, 2010 WL 3861371 (D. Minn. July 12, 2010).

IGRA," the National Indian Gaming Commission ("NIGC"), to review the arrangement regarding the Fond du Luth Casino and give its recommendation.  (Dec. 26, 1990, Order at 6 [Doc. No. 10-11].)

Upon review of the 1986 Agreement, the NIGC concluded that the casino's operation violated the IGRA because "the Band does not have the sole ownership or control" of the casino.  (NIGC Sept. 24, 1993, Letter at 1-2 [Doc. No. 11-1].)  The NIGC Chairman advised the parties that unless the parties "are able to settle the pending dispute, [the NIGC] will be initiating an enforcement action to bring the Fond du Luth gaming operation into compliance with IGRA."  (Id. at 1.)

The parties' settlement negotiations produced seven new agreements in June 1994 ("1994 Agreements").  These agreements reorganized their relationship to eliminate the joint venture, but the City retained rights regarding various aspects of operating the casino.  The parties agreed on an "Initial Term" of seventeen years (from 1994 through March 31, 2011), with an "Extension Term" of twenty-five years (from April 1, 2011 to March 31, 2036).  (Sublease and Assignment of Gaming Rights Agreement, at 8-9 [Doc. No. 12-2].)  In addition, from 1994 to 2011, the Band was required to pay the City nineteen percent of the casino's gross revenues as "rent."  (Id. at 11.)  The rental rate from 2011 to 2036 was to be negotiated at a later date.  (Id. at 16.)  Because the 1994 Agreements required a determination by the NIGC that it did not violate the IGRA, the parties submitted them to the NIGC, which issued its approval.  (June 20, 1994, Letter [Doc. No. 11-4].)  The NIGC recommended to Judge Magnuson that the 1994 Agreements be approved.  (Id. at 2.)  On June 22, 1994, the district court issued an order

incorporating the detailed stipulation of the parties into a consent decree. (Stipulation and Consent Order [Doc. No. 11-7].)

Consistent with the terms of this consent decree, the Band paid the City approximately $75 million in rent from 1994 until 2009. The Band then ended payments on the ground that it had been paying the City more than nineteen percent of the casino's gross revenues because certain expenses should have been considered as offsets against revenue. In September 2009, after the Band did not respond to the City's request to cure its breach, the City brought this action to enforce the 1994 Agreements. (Compl. [Doc. No. 1].) The Band filed a counterclaim alleging that the consent decree was inconsistent with the IGRA and should therefore be dissolved. (Answer and Countercl. [Doc. No. 3].)

In December 2009, the City moved for summary judgment. (Pl.'s Mot. for Summ. J. [Doc. No. 7].) In April 2010, this Court ruled that the Band's argument about the legality of the consent decree was barred by res judicata because the decree had been approved by the court and formalized in a judgment. (Apr. 21, 2010, Order at 7-9 [Doc. No. 73].) The Court also decided to schedule a trial on the question of whether the Band had overpaid the City between 1994 and 2011. (Id. at 18-19.) The Court further noted that the consent decree indicated that the payment plan for the 2011-2036 period would be decided by arbitration. (Id. at 19.) After another round of arguments by the parties, the Court ordered the parties to submit the issues related to the 2011-2036 period to arbitration. (May 13, 2011, Order [Doc. No. 179].)

Meanwhile, the Band sought review of the 1994 Agreements by the NIGC. On July 12, 2011, shortly after the parties began arbitration, the NIGC issued a notice of

violation ("NOV").  (Notice of Violation [Doc. No. 208-1].)  This NOV determined that the provisions in the 1994 consent decree violated the IGRA's "sole proprietary interest" rule, and it ordered the Band to cease performance or face sanctions, including fines and the possible closure of the casino.  (Id. at 18-19.)

On July 14, 2011, the Band informed this Court of the NOV as well as of its intent to seek relief from the consent decree.  (July 14, 2011, Letter to District Judge [Doc. No. 202].)  On July 22, 2011, the Band moved for dissolution of the consent decree under Federal Rule of Civil Procedure 60(b).  (Fond du Lac Band of Lake Superior Chippewa's Mot. for Relief from Consent Order, Summ. J. Order, and Order Compelling Arbitration under Rules 60(b)(5) and 60(b)(6) [Doc. No. 207].)  On November 21, 2011, this Court relieved the Band "of any further compliance with its obligations under the 1994 Agreements."  (Nov. 21, 2011, Order at 29 [Doc. No. 231].)  Regarding "retroactive relief," it held that the Band could not recover its previously paid rent and that the Band must pay the withheld rent from 2009 to 2011.  (Id.)  Finally, the Court stated that a trial would be scheduled later on the issue of "contra-revenues"—that is, whether the Band may recover any overpayments to the City by recognizing certain expenses as offsets against revenues.  (Id.)

Both parties appealed the November 21, 2011, Order.  The City appealed the prospective dissolution of the consent decree relating to the 2011-2036 term.  The Band appealed the ruling compelling it to pay rent that it had withheld from 2009 to 2011, but did not appeal the ruling that it could not recover the rent already paid from 1994 to 2009. On January 14, 2013, the Eighth Circuit (1) affirmed this Court's ruling under Rule

5

60(b)(5) relieving the Band of prospective compliance with the 1994 consent decree, and

(2) reversed the denial of the Band's request for retrospective relief under Rule 60(b)(6)

and remanded that question for further proceedings.  City of Duluth, 702 F.3d at 1156.

The Eighth Circuit directed this Court to examine all relevant factors as to whether

retrospective relief for the 2009-2011 period is available to the Band under Rule 60(b)(6).

## III.   DISCUSSION

### A.  Rule 60(b)(6)

#### 1.  Standard of Review

Federal Rule of Civil Procedure 60(b) may be used to reconsider a final judgment

on grounds including excusable neglect, fraud, newly discovered evidence, or "any other

reason that justifies relief."  FED. R. CIV. P. 60(b); 11 Charles Alan Wright, Arthur R.

Miller, and Mary Kay Kane, Federal Practice and Procedure § 2852 (2d ed. 1995).  A

consent decree is subject to Rule 60(b) the same as any other judgment or decree.  Rufo

v. Inmates of the Suffolk Cnty. Jail, 502 U.S. 367, 378 (1992).  Rule 60(b)(6) is a "grand

reservoir of equitable power."  Phelps v. Alameida, 569 F.3d 1120, 1135 (9th Cir. 2009).

It affords courts the discretion to vacate judgments whenever such action is appropriate to

accomplish justice.  Klapprott v. United States, 335 U.S. 601, 614-15 (1949); Ritter v.

Smith, 811 F.2d 1398, 1400 (11th Cir. 1987).  Such relief, however, is "exceedingly rare"

because it requires an intrusion into the sanctity of a final judgment, and therefore, it is

available only in "extraordinary circumstances."  In re Guidant Corp. Implantable

Defibrillators Prod. Liab. Litig., 496 F.3d 863, 868 (8th Cir. 2007).  Extraordinary

circumstances are not present every time a party is subject to potentially unfavorable

consequences as a result of an adverse judgment at which a court properly arrived.  Id.

Circumstances are exceptional when they "have denied the moving party a full and fair

opportunity to litigate his claim" and "have prevented the moving party from receiving

adequate redress."  Murphy v. Missouri Dep't of Corr., 506 F.3d 1111, 1117 (8th Cir.

2007).  A more compelling showing of inequity or hardship is necessary to warrant relief

under Rule 60(b)(6) than Rule 60(b)(5).  Twelve John Does v. Dist. of Columbia, 841

F.2d 1133, 1140 (D.C. Cir. 1998) ("otherwise, the ready availability of subsection (6)

would make meaningless the limitation of subsection (5) to judgments with prospective

application.").

### 2.  Extraordinary Circumstances

In determining whether a matter presents "extraordinary circumstances" for

purposes of Rule 60(b)(6), courts examine several factors.  A clear-cut change in the law

is a necessary but insufficient basis for granting relief.  Ritter, 811 F.2d at 1401

("something more than a 'mere' change in the law is necessary to provide the grounds for

Rule 60(b)(6) relief.").  Courts also consider: (1) whether the previous, erroneous

judgment of the court has yet to be executed; (2) whether there has been a lengthy delay

before the filing of the Rule 60(b)(6) motion; (3) whether there is a close relationship

between the proceeding that gave rise to the change in the law and the proceeding

currently before the court, including whether the two proceedings "arose out of the same

transaction"; and (4) whether the case raises concerns of comity between the state and

federal courts.[2] Id. at 1401-03.

The Eighth Circuit, in its mandate for remand, set forth additional considerations

for this Court: (1) the Band and the City's voluntary agreement to the provisions

incorporated in the 1994 consent decree; (2) the NIGC's initial endorsement of the 1994

Agreements; (3) the NIGC's lack of authority to punish a party for obeying a court order;

(4) whether the City was on notice that the NIGC's views on the validity of the 1994

Agreements might have changed before the July 12, 2011, NOV issued; and (5) whether

the July 12, 2011, NOV was an "exceptional" occurrence justifying Rule 60(b)(6) relief.

City of Duluth, 702 F.3d at 1155.  To the extent these considerations overlap with factors

considered by other courts, the Court addresses them together.

### a.  Change in Law

The Eighth Circuit directed this Court to consider whether the NOV issued by the

NIGC on July 12, 2011—changing its earlier position and ordering the Band to cease

performance under the consent decree—was an "exceptional" occurrence justifying

60(b)(6) relief.  City of Duluth, 702 F.3d at 1156.  The Band argues that it is, because

without modification, "the Consent Order presents the extraordinary circumstance of

forcing the Band to perform illegal operations."  (Def.'s Mem. of Law in Support of Mot.

for Relief from Consent Order and Summ. J. Order under Rule 60(b)(6) at 4 [Doc. No.

262].)  The Band emphasizes that the NIGC's decision that the 1994 Agreements are

illegal under the IGRA makes any remaining performance of the contractual terms legally

---

[2] The Band represents that there are no concerns of comity between state and federal courts here.  (June 27, 2013, Hr'g Tr. at 13.)  Thus, the Court finds that this factor is neutral toward granting or denying the Band's requested relief under Rule 60(b)(6).

impracticable.  (Id. at 5-7.)  In response, the City argues that the July 12, 2011, NOV is not an exceptional occurrence justifying 60(b)(6) relief because changes in law do not ordinarily have retroactive effect.  (Pl.'s Mem. of Law in Opp'n on Remand to Def.'s Rule 60(b) Mot. at 9-11, 14 [Doc. No. 269].)

Although a change in law is a necessary basis for granting relief, it does not always provide the truly extraordinary circumstances necessary to reopen a case.  See Collins v. City of Wichita, 254 F.2d 837 (10th Cir. 1958).  In Collins, the plaintiffs challenged the constitutionality of a Kansas statute relating to the notice required to be given to a landowner in condemnation proceedings.  Id. at 838.  The statute was upheld and the judgment became final after appeal.  Id.  One year later, the United States Supreme Court decided an identical case and invalidated the statute.  Id.  The plaintiffs subsequently sought relief from their judgment under Rule 60(b)(6).  Id.  The district court denied the motion and the Tenth Circuit affirmed, stating that "[l]itigation must end some time, and the fact that a court may have made a mistake in the law, when entering judgment, or that there may have been a judicial change in the court's view of the law after its entry, does not justify setting it aside."  Id. at 839.  Persuaded by Collins' language about the need for finality to litigation, the Court finds that the change in law presented by the July 12, 2011,[3] NOV, alone, is a necessary but insufficient basis to grant relief under Rule 60(b)(6).  Other factors, in addition to the change in law here, are

---

[3] The July 12, 2011, NOV constitutes a change in the law because in direct contrast to the NIGC's original approval of the 1994 Agreements, the NOV concludes that the terms of the 1994 Agreements violate the IGRA and directs the Band to stop complying with the violative provisions.

necessary for the Court to consider in determining whether the circumstances are sufficiently extraordinary to warrant the requested relief.

As for the City's argument that changes in law do not ordinarily have retroactive effect, the Court agrees.  See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) ("a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.").  When a change in law makes an impact on a consent decree or permanent injunction, such judgments typically have both past effects and future implications.  Ritter, 811 F.2d at 1402.  Although courts have granted prospective 60(b)(6) relief because "it would be unjust to give prospective effect to a judgment now known to be improper," they have generally "refused to undo the past, executed effects of the judgments."  Id.  Here, the July 12, 2011, NOV explicitly requires the Band to

> . . . cease performance under the 1994 Agreements of those provisions identified in the NOV as violating IGRA.  This applies to the entire 42 year term of the 1994 Agreements.

(Notice of Violation at 18 [Doc. No. 208-1].)  With applicability "to the entire 42 year term" of the agreements, the NOV has both past effects on and future implications for compliance with the 1994 consent decree.  Regarding the future implications, this Court granted prospective relief to the Band under Rule 60(b)(5), which the Eighth Circuit affirmed.  City of Duluth, 702 F.3d at 1156.  The past effects, for purposes of this motion,

concern the unpaid rent due under the 1994 Agreements from 2009 until 2011.[4]  Because

Congress has not granted NIGC the power to promulgate retroactive rules in express

terms,[5] the Court finds that enforcing the NOV for the initial term of the 1994

Agreements—which ended three months before the NOV was issued—would be an

impermissible retroactive application.

### b.  Execution of the 1994 Consent Decree

Whether the previous, erroneous judgment of this Court has been executed is a

"significant factor" in determining whether the circumstances are extraordinary enough to

warrant relief under Rule 60(b)(6).  See Ritter, 811 F.2d at 1401.  When a court has

executed a judgment, a "concomitantly greater interest in finality exists."  Id.  In Collins,

for instance, the Tenth Circuit affirmed a denial of 60(b)(6) relief, in part because the

judgment had been executed.  245 F.2d at 839.  Specifically, the city had entered the land

and installed pipes and appurtenances, and the case involved property rights pertaining to

real estate titles.  Id. n.2.  And in Hall v. Warden, 364 F.2d 495 (4th Cir. 1966), the court

ruled that a subsequent Supreme Court decision would not be grounds to reopen the

court's grant of habeas relief because by that time, Hall had been retried in a proceeding

that suppressed a confession and resulted in a mistrial.  Id. at 496.   By contrast, the court

in Flexiteek Am., Inc. v. PlasTEAK, Inc., No. 8-60996-CIV, 2012 WL 5364263, at *10

---

[4] The initial term of the 1994 Agreements ended on April 1, 2011, and all payments for
that term were due on or before March 31, 2011.

[5] 25 U.S.C. § 2706 sets forth the powers of the NIGC.  Subsection (b)(10) authorizes the
promulgation of rules and guidelines appropriate to implement the provisions of the
IGRA, but does not state that such rules or guidelines can be applied retroactively.  25
U.S.C. § 2706(b)(10).  The remainder of § 2706 does not authorize retroactive
application of NIGC rulings or regulations.

(S.D. Fla. Sept. 10, 2012), granted relief under Rule 60(b)(6), in part because after the

Patent and Trademark Office invalidated one of the patent claims at issue, the Court

stayed execution of the previous judgment.  These examples embody the principle that

Rule 60(b)(6) relief is less warranted when the final judgment being challenged has

caused one or more of the parties to change his legal position in reliance on that

judgment.

The Band argues that the previous, erroneous judgment has not been executed

because it has yet to pay the rent due under the 1994 Agreements for the 2009-2011

period.  (June 27, 2013, Hr'g Tr. at 13.)  The Court respectfully disagrees.  On June 22,

1994, the parties entered into a stipulation, agreeing that (1) dismissal of the Band's

action with prejudice was warranted; (2) the 1994 Agreements complied with the "sole

proprietary interest" requirement; (3) the NIGC reviewed the 1994 Agreements and

concluded that they conformed with the IGRA; and (4) the 1994 Agreements and all of

its attachments "are in their entirety expressly incorporated into this Stipulation and

Consent Order, and are hereby expressly made a part of it."  (Stipulation and Consent

Order [Doc. No. 11-7].)  The parties also informed Judge Magnuson that they "jointly

desire the Court's approval in order to ensure binding implementation of the settlement

agreement."  (Joint Mem. in Supp. of Proposed Stipulation and Consent Order at 13

[Doc. No. 13-1].)  In July 1993, Judge Magnuson issued a consent decree approving the

parties' stipulation, dismissing the Band's Complaint with prejudice, and ordering that

the Court retain jurisdiction over the matter to ensure the parties' compliance with the

1994 Agreements.  (Id. at 6 [Doc. No. 11-7].)  Since then, no court has stayed execution

12

of this consent decree, and indeed, the Band complied with it until 2009.  The Court finds

that the active status of the consent decree here is more akin to the judgments in <u>Collins</u>

and <u>Hall</u> than in <u>Flexiteek</u>, and the City has relied on its right to payments under the 1994

Agreements.  Thus, the "significant factor" of the executed consent decree weighs in

favor of denying the Band relief under Rule 60(b)(6).

### c.  Delay in Filing for Relief Under Rule 60(b)(6)

Next, the Court considers whether the Band delayed in seeking Rule 60(b)(6)

relief.  Time is relevant because the longer the delay, "the more intrusive is the effort to

upset the finality of the judgment."  <u>Ritter</u>, 811 F.2d at 1402.  On July 12, 2011, the

NIGC issued the NOV.  (Notice of Violation [Doc. No. 208-1].)  On July 14, 2011, the

Band informed the Court of the NOV and its intent to seek relief from the consent decree.

(July 14, 2011, Letter to District Judge [Doc. No. 202].)  On July 22, 2011, the Band

moved for dissolution of the consent decree under Rule 60(b).  (Fond du Lac Band of

Lake Superior Chippewa's Mot. for Relief from Consent Order, Summ. J. Order, and

Order Compelling Arbitration under Rules 60(b)(5) and 60(b)(6) [Doc. No. 207].)  Given

this short timeline of events, the Court finds that the Band was diligent in seeking relief

under 60(b)(6).  This factor therefore supports granting the Band its requested relief.

### d.  Relationship Between the 1994 Consent Decree and the July 12, 2011, NOV

Another factor for the Court to consider is whether there is a close relationship

between the two cases at issue: the decision embodying the original judgment and the

subsequent decision embodying the change in law.  <u>Ritter</u>, 811 F.2d at 1402.  This factor

is designed to recognize that under common law, legal rules and principles regularly evolve. Phelps, 569 F.3d at 1139. The mere fact that law changes over time, however, cannot upset all final judgments that have predated any specific change in the law. Id. Instead, it is the nature of the change that matters. Id. If there is a close connection between the two cases, courts are more likely to find the circumstances sufficiently extraordinary to justify disturbing the finality of the original judgment. Id.

In Phelps and Ritter, the intervening change in the law directly overruled the decision for which reconsideration was sought. In Ritter, the intervening Supreme Court precedent resolved a split between the Eleventh Circuit and the Alabama Supreme Court. 811 F.2d at 1400. In Phelps, the intervening precedent resolved a conflict between multiple Ninth Circuit panels that had issued contemporaneous but contradictory memorandum dispositions. 569 F.3d at 1136. Both cases found that this factor weighed in favor of granting relief under Rule 60(b)(6).

In the instant case, the 1994 consent decree and the July 12, 2011, NOV are closely related. They involve the same parties and arise out of the 1994 Agreements. (See June 27, 2013, Hr'g Tr. at 13.) And similar to the changes in law that overruled the earlier decisions in Phelps and Ritter, the NOV directly contradicts the 1994 consent decree. Whereas the consent decree found the terms of the 1994 Agreements to be permissible and in compliance with the IGRA, the NOV determined that the terms of the 1994 Agreements violated the IGRA and directed the Band to cease performance under the agreements. (Notice of Violation at 18 [Doc. No. 208-1].) Thus, the Court finds that this factor weighs in favor of granting 60(b)(6) relief.

### e.   The Parties' Voluntary Agreement to the 1994 Consent Decree

The City argues that relief under Rule 60(b)(6) is unjustified because the parties voluntarily agreed to the 1994 consent decree.  (Pl.'s Second Mem. of Law in Opp'n on Remand to Def.'s Rule 60(b)(6) Mot. at 14 [Doc. No. 269].)  The Band argues that the parties' consent to the 1994 Agreements is immaterial in light of its current illegality.  (Def.'s Mot. for Relief from Consent Order and Summ. J. Order under Rule 60(b)(6) at 26 [Doc. No. 260].)

Extraordinary circumstances rarely exist when a party seeks relief from a judgment that resulted from the party's deliberate choices.  See Ackermann v. United States, 340 U.S. 193, 198-99 (1950); Coltec Indus., Inc. v. Hobgood, 280 F.3d 262, 274 (3d Cir. 2002) ("courts have not looked favorably on the entreaties of parties trying to escape the consequences of their own 'counseled and knowledgeable' decisions.").  In Ackermann, which involved the denaturalization of two naturalized German citizens during World War II, Ackermann decided not to appeal, believing the issue would find resolution after the war.  When his brother-in-law's appeal succeeded, Ackermann filed for Rule 60(b)(6) relief from his denaturalization.  The Supreme Court held that such relief was appropriately denied because:

> Petitioner made a considered choice not to appeal, apparently because he did not feel that an appeal would prove to be worth what he thought was a required sacrifice of his home.  His choice was a risk, but calculated and deliberate and such as follows a free choice.  Petitioner cannot be relieved of such a choice because hindsight seems to indicate to him that his decision not to appeal was probably wrong . . . There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from.

340 U.S. at 198.  The Supreme Court contrasted Ackermann's situation with that of

Klapprott v. United States, 335 U.S. 601 (1949), in which Klapprott failed to defend

against denaturalization charges but had been in custody, sick, unable to procure counsel

despite efforts to do so, and preoccupied by efforts to defend against serious criminal

charges.  Ackermann, 340 U.S. at 199-200.  Under those circumstances, the Supreme

Court noted that "[b]y no stretch of imagination can the voluntary, deliberate, free,

untrammeled choice of petitioner [Ackermann] not to appeal compare with the Klapprott

situation."  Id. at 200.

        The Court is sympathetic to the Band's "dire and uncertain economic

circumstances" when it first "negotiated the best deal it could to bring long-term

opportunity to its members" in 1986.  (Def.'s Mot. for Relief from Consent Order and

Summ. J. Order under Rule 60(b)(6) at 26 [Doc. No. 260].)  But when the Band later

renegotiated its arrangement with the City, which resulted in the 1994 Agreements, both

parties were represented by counsel when they entered into the agreements.  Similar to

Ackermann, who freely and purposefully chose not to appeal, the Band voluntarily and

deliberately chose to agree to the renegotiated arrangement—an agreement that has

benefited both parties significantly.  Indeed, the voluntariness and deliberateness of the

Band's choice are apparent in the Band's subsequent request to the NIGC to approve the

terms of the 1994 Agreements, and even more so in the parties' statement to Judge

Magnuson that they "jointly desire the Court's approval in order to ensure binding

implementation of the settlement agreement."  (Joint Mem. in Supp. of Proposed

Stipulation and Consent Order at 13 [Doc. No. 13-1].)  Under these circumstances, the

Court finds that the Band made an informed, counseled, and voluntary decision to enter into the terms of the 1994 Agreements. This consideration weighs in favor of denying the requested relief under Rule 60(b)(6).

### f.   The NIGC's Initial Endorsement of the 1994 Agreements

The Eighth Circuit sets forth the NIGC's initial endorsement of the 1994 Agreements as a factor for why retrospective relief might be inappropriate. <u>City of Duluth</u>, 702 F.3d at 1155. The City argues that the parties reasonably relied on the NIGC's approval of the renegotiated agreement, because they worked with the NIGC for months before completing an agreement that satisfied the NIGC and the Department of Interior. (Pl.'s Second Mem. of Law in Opp'n on Remand to Def.'s Rule 60(b) Mot. at 14 [Doc. No. 269].)

The Court agrees with the City. After Judge Magnuson's December 26, 1990, Order, the NIGC reviewed the Fond DuLuth Casino operation. (June 20, 1994, Letter at 1 [Doc. No. 11-4].) On September 24, 1993, the NIGC notified the parties that the joint venture agreement in effect at the time violated provisions of the IGRA. (<u>Id.</u>) After being notified of the NIGC's finding, the parties then began negotiations to bring the casino into compliance with the IGRA, which resulted in the 1994 Agreements. (<u>Id.</u> at 1-2.) On June 20, 1994, the Chairman of the NIGC submitted the following in a Report and Recommendation to Judge Magnuson:

> Pursuant to your December 26, 1990, Order, I am writing to report that the settlement recently concluded between the Fond Du Lac Band and the City of DuLuth returns ownership and control of the Fond DuLuth Casino to the Band and is fully consistent with the IGRA. Accordingly, I recommend that this settlement agreement be approved.

17

(June 20, 1994, Letter [Doc. No. 11-4].)  Although the Chairman did not provide an analysis supporting his recommendation, this statement—particularly on the heels of the NIGC's notice that the previous joint venture agreement violated the IGRA, and the subsequent negotiations resulting in the 1994 Agreements—was reason for the Court and the parties to accept the terms of the new agreements.  The 1994 consent decree remains valid for the 2009-2011 period at issue.  The Court therefore finds that this factor weighs in favor of denying the Band's requested relief.

### g.  The NIGC's Lack of Authority to Punish for Disobeying a Court Order

The Band supports its request for Rule 60(b)(6) relief on the ground that compliance with the 1994 Consent Order will risk daily fines of $25,000 per violation and closure of the casino.  (Def.'s Mem. of Law in Supp. of Mot. for Relief from Consent Order and Summ. J. Order under Rule 60(b)(6) at 9 [Doc. No. 262].)  The City argues that no sanctions have been imposed, and that either way, the Band has a complete defense because it is complying with a court order.  (Pl.'s Second Mem. of Law in Opp'n on Remand to Def.'s Rule 60(b) Mot. at 19 [Doc. No. 269].)

The Eighth Circuit observed that although "the NIGC had the power to change its position, it does not have the authority to punish a party for obeying a court order."  City of Duluth, 702 F.3d at 1155.  Judge Magnuson's 1994 consent decree, approving and incorporating the terms of the 1994 Agreements, remains valid regarding the initial term and awaits the Band's compliance for the 2009-2011 unpaid rent.  Should the NIGC impose civil fines or close the casino in response to the Band's compliance with the

consent order, this Court agrees with the City that the Band has a defense. Thus, this factor weighs in favor of denying the Band retrospective relief under Rule 60(b)(6).

### h. Notice

In its mandate for remand, the Eighth Circuit stated that "[b]y the time the Band began withholding rent in 2009, the City was on notice that the NIGC's views on the validity of the 1994 agreement might well have changed." City of Duluth, 702 F.3d at 1155. The Eighth Circuit reasoned that after the NIGC initially approved the agreement, it issued several advisory letters noting that "similar arrangements between other tribes and casinos had been found to violate the sole proprietary interest rule." Id. The Eighth Circuit also stated that the "intervening decisions by the NIGC likely were available and accessible to the parties, and they may well have relevance in ascertaining whether retrospective relief should be granted." Id.

The Court has reviewed the NIGC's advisory letters to which the Eighth Circuit directs our attention, which were included in this Court's previous consideration:

- A June 2003 advisory letter from the NIGC, concluding that gaming related contracts requiring a tribe to pay, ostensibly as rent, 35% of net gaming revenues for a period of ten years to an outside developer violated the sole proprietary interest requirement, [Doc. No. 46-4];

- An April 2004 advisory letter from the NIGC, concluding that development contracts entitling a developer to 75% of net revenue in the first five years and 18% of gross revenue for the next ten years violated the sole proprietary interest requirement, [Doc. No. 45-13];

- A July 2004 advisory letter from the NIGC, concluding that an outside developer had acquired an illegal proprietary interest in gaming activity because the development contracts provided the developer with 75% of net revenue in the first five years and 16% of gross revenue for the next ten years, [Doc. No. 46-5];

- A February 2005 letter from the NIGC Chairman to the Senate Committee on Indian Affairs recounting some of the situations in which the NIGC opined that an arrangement between a tribe and an outside party violated the sole proprietary interest requirement, [Doc. No. 46-3];

- An October 2006 advisory letter from the NIGC, concluding that an outside party retained to develop two casinos had acquired a proprietary interest in gaming operations on Indian lands because of "the excessive amount of revenue it will be paid from the Tribe's gaming facility relative to the services provided," [Doc. No. 45-11]; and

- A June 2007 proposed civil fine assessment by the NIGC, finding that an outside company hired to manage blackjack and gaming machine operations at casinos on Indian lands had acquired a proprietary interest in the gaming activity, in violation of § 2710(b)(2)(A), when the company received 53.8% of net revenue, [Doc. No. 45-10].

(See Apr. 21, 2010, Order at 13-14 [Doc. No. 73].)  None of these documents is directed to the City or the Band.  The City distinguishes the situations in these advisory letters from its own circumstances, arguing that (1) the advisory letters involve land that the tribe at issue already owned; (2) none of them had the approval of the NIGC or of a final consent order; and (3) the Court's April 21, 2010, Order considered these letters and nonetheless found the 1994 Agreements to be valid.  (Pl.'s Second Mem. of Law in Opp'n on Remand to Def.'s Rule 60(b) Mot. at 16 [Doc. No. 269].)

This question is a close call, but the Court ultimately finds that the City was on notice that the NIGC's views on the validity of the 1994 Agreements might well have changed.  Even if the City did not receive an advisory letter directed to it specifically, these letters are publicly available on the NIGC website.  The City, like everyone else, is "presumptively charged with knowledge of the law."  Atkins v. Parker, 472 U.S. 115, 130 (1985).  Although the circumstances of the advisory letters are technically different from

20

those here, they indicate the development of and general changes to the NIGC's "sole proprietary interest" analysis.  And certainly, by 2011, the City was on full notice that the NIGC would issue a decision on the Band's most recent request for review of the 1994 Agreements: the City participated in the process by filing briefs and expert reports.  (June 27, 2013, Hr'g Tr. at 29; Aff. of Alan P. Meister [Doc. No. 228-2].)  Therefore, the City's notice weighs in favor of granting Rule 60(b)(6) relief to the Band.

Having carefully evaluated the factors set forth by the Eighth Circuit and other courts for Rule 60(b)(6) relief, the Court concludes, however, that the Band's motion does not demonstrate the extraordinary circumstances necessary to grant the requested relief.  To be sure, certain factors support the Band's request, namely: (1) the diligence with which the Band sought relief under Rule 60(b)(6) after receiving the NIGC's July 12, 2011, NOV; (2) the close relationship between the 1994 consent decree and the July 12, 2011, NOV; and (3) the fact that by the time the Band began withholding rent in 2009, the City was on notice that the NIGC's views on the validity of the 1994 Agreements might have changed.  Other factors, however, prevent the Band's circumstances from rising to the truly extraordinary level required for Rule 60(b)(6) relief, including: (1) the fact that the change in law presented by the July 12, 2011, NOV, alone, is insufficient to grant retrospective relief; (2) the 1994 consent order is a past, executed judgment on which the City has relied; (3) the parties voluntarily and deliberately entered into the terms of the 1994 Agreements; (4) the NIGC recommended in 1994 that Judge Magnuson approve the settlement agreement; and (5) the Band has a defense to complying with a valid court order, should it face any sanctions by the NIGC.

21

The Court recognizes that the Band has paid approximately $75 million to the City under the 1994 Agreements, and that requiring it to remit the remaining $10,392,412.40 owed for the 2009-2011 term is a significant burden.  But the Court also notes that the Band has benefited substantially from the 1994 Agreements.  From 1994 to 2009, the Band earned approximately $175 million in net profit.  And since the Band stopped payments in 2009, it has profited more than $20 million while receiving the City's services for free.  Particularly since the Band has now received complete prospective relief from the 1994 consent order, the circumstances altogether do not rise to the level of the truly extraordinary to warrant retrospective relief under Rule 60(b)(6).

### B.  Motion to Stay

The City has moved to stay the current proceedings on remand pending the disposition of City of Duluth v. Nat'l Indian Gaming Comm'n, an Administrative Procedures Act action brought by the City on February 26, 2013.  (Pl.'s Mot. to Stay Proceedings on Remand [Doc. No. 255].)  The City argues that the outcome of that case and the validity of the NIGC's July 12, 2011, NOV to be there determined is a necessary and relevant factor for this Court to consider on remand.  (Id.)

Because the Court denies the Band's motion for Rule 60(b)(6) relief, it denies the City's motion to stay as moot.

### V.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendant's motion for relief under Rule 60(b)(6) [Doc. No. 260] is **DENIED**;

2.  Plaintiff's motion to stay [Doc. No. 255] is **DENIED** as moot;

3.  The parties shall contact the Court's chambers to schedule a trial confined to the issue of the Band's retention of the disputed "contra-revenues."  The Court will then rule on the amount owed by the Band to the City for the rent withheld for 2009, 2010, and 2011.

Dated:  October 8, 2013                           s/ Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Court Judge